# Illinois Official Reports

## Supreme Court

---

**In re Rita P., 2014 IL 115798**

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* RITA P. (The People of the State of Illinois, Appellant, v. Rita P., Appellee). |
| Docket No. | 115798 |
| Filed | May 22, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Mental Health Code provision for findings of fact on the record in granting a 90-day involuntary medication order is directory rather than mandatory, and a circuit court's expression only of its legal conclusion that the evidence was overwhelming did not call for reversal where there were no claims of evidentiary insufficiency or compromised due process—mootness exception. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Paul A. Karkula, Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment affirmed. |

Counsel on Appeal

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People.

Ann Krasuski, Veronique Baker and Laurel Spahn, of the Legal Advocacy Service of the Guardianship and Advocacy Commission, of Hines, for appellee.

Mark J. Heyrman, of Chicago, for *amicus curiae* Mental Health America of Illinois.

Justices

JUSTICE THEIS delivered the judgment of the court, with opinion. Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

¶ 1     On September 2, 2011, the Cook County circuit court entered an order authorizing the involuntary treatment of respondent, Rita P., with psychotropic medication. On appeal, respondent argued that the treatment order must be reversed because the trial court failed to comply with section 3-816(a) of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/3-816(a) (West 2010)), providing that final orders "shall be accompanied by a statement on the record of the court's findings of fact and conclusions of law." The appellate court agreed with respondent and reversed the treatment order. 2013 IL App (1st) 112837.

¶ 2     For the reasons that follow, we reverse the judgment of the appellate court and affirm the judgment of the trial court.

¶ 3                    BACKGROUND

¶ 4     On August 18, 2011, Dr. He Yuan, a psychiatrist at Chicago-Read Mental Health Center (Chicago-Read), filed a petition seeking a court order authorizing involuntary treatment of respondent. In the petition, Dr. Yuan described, *inter alia*, respondent's symptoms, the deterioration in her ability to function, the behaviors in which she engaged that were dangerous to herself and others, and the therapies that had been tried without success. Dr. Yuan stated that respondent met the criteria for a diagnosis of "schizophrenia paranoid type," and requested authorization to administer specific medications, including Risperidone, for a period of up to 90 days.

¶ 5     A hearing on the petition was held on September 2, 2011. The State called two witnesses: respondent's son, Mayjourio, and Dr. Yuan. Mayjourio testified that he was 24 years old and

had lived with respondent in her Evanston home for the past six to seven years. In January 2008, respondent was operating a daycare business in her home. At that time, Mayjourio noticed that respondent was very agitated and angry, and spoke about harming the people that had wronged her. For two months she spoke about "going out there and getting herself some street justice." In March 2009, Mayjourio observed that respondent had begun talking to herself. She would go into the bedroom or the laundry room, close the door, and have a one-sided conversation. "[S]he would talk, and then she would be quiet, and then she would talk some more, and then be quiet. It was as if she was talking, listening, talking, listening." Mayjourio further testified that at the same time respondent began talking to herself, her sleep habits changed. Respondent, who had been a heavy sleeper, was now up in the middle of the night talking to herself in her bedroom.

¶ 6 In December 2009, respondent began manifesting different personalities. Mayjourio explained that the silences in respondent's one-sided conversations were now filled with other voices, both male and female. Shortly after the appearance of these additional voices, respondent, without explanation, stopped attending choir practice at her church. According to Mayjourio, respondent was a religious woman who attended the Apostolic Church of God on the south side of Chicago. Mayjourio testified that in February 2010, respondent told him that, although no church members had been physically in her home, they were present spiritually, and had "spiritually raped" her.

¶ 7 Mayjourio described an incident in September 2010, in which respondent had "one of her moments," *i.e.*, a "conversation between her[self] and several of her voices," and left a pot of water on the stove too long, causing the pot to be blackened. Mayjourio testified that these conversations were time-consuming and took her attention away from other matters. Because respondent was still operating her daycare business, Mayjourio and his sister made sure that one of them was always present so that none of the children were hurt if respondent had one of her "moments."

¶ 8 Mayjourio also described three incidents, the first of which occurred in September 2010, in which he found respondent with her hands around her own neck choking herself. Respondent denied that she choked herself, telling Mayjourio that it was "the church" or "the voices." In October 2010, respondent told Mayjourio that she was going to get a gun and kill the members of the church who attacked her. Respondent attempted to get a gun license, and asked Mayjourio to take her to a gun range to practice. Mayjourio testified that during this period, as he had for the past two years, he talked to respondent about seeing a doctor. Every time he brought up the subject, he was met with anger and opposition.

¶ 9 Mayjourio additionally testified regarding an incident in February 2011, in which he came home and discovered an open container of gasoline in the living room. Respondent was still operating her home daycare business at this time. Respondent initially told Mayjourio that she was using the gasoline as a cleaner, but later told him that she was doing experiments. Mayjourio moved the gasoline to the garage, but the following month he found the open gasoline container in the basement, along with turpentine and lighter fluid. Respondent again stated that she was doing experiments.

¶ 10 Mayjourio testified that respondent's condition worsened in the following months:

> "She [would] be up at night outside in the front yard, outside in the back yard having screaming matches with the lamp post, and the ground, and the air.
>
> And all the while all the voices are manifesting themselves. She will be in the room screaming, yelling. You will be woke[n] up at 2:00 in the morning to her having one of her fits with herself.
>
> *** [B]efore the voices wouldn't confront you, but now the voices confront you.
>
>              * * *
>
> If you look at her and say, 'Mom, what's going on,' Rita doesn't reply. One of the voices replies, 'My name ain't Rita.' "

¶ 11 Mayjourio lastly testified regarding the incident immediately preceding respondent's hospitalization. Mayjourio came home from work and found respondent lying in her bed, staring at the ceiling. Mayjourio attempted to rouse her, but she was nonresponsive. After ten minutes, respondent, in a man's voice, told Mayjourio, "This ain't Rita. *** Rita dead. Rita going to be dead by tomorrow morning if Rita ain't dead now. This is the church. Rita dead." Mayjourio attempted to remove respondent from the bedroom to take her to the hospital, but she resisted, swinging her arms, pulling Mayjourio's hair, and kicking his glasses off of his face, still speaking in a man's voice. Mayjourio called 911. When the police arrived, they tried to speak to respondent. She answered in a man's voice, again stating that Rita is dead. The officers, with the help of three EMTs, were able to get respondent onto a gurney and into the ambulance for transport to the hospital. Mayjourio testified that four knives were found in her bedroom. Although acknowledging that respondent ate her meals in her bedroom and that she would have brought utensils with her, Mayjourio testified that the utensils would not have included "big knives" like the ones found in her bedroom.

¶ 12 Dr. Yuan testified that he first saw respondent on August 5, 2011 at Chicago-Read, and had seen her almost daily thereafter. He opined that respondent has a mental illness—schizophrenia paranoid type—in which she has significant delusions regarding church people embodied spiritually and physically inside her. Respondent admitted to Dr. Yuan that she tried to choke herself to kill the people inside her. As of the day before the hearing, respondent still believed she was embodied by church members, but she had not tried to choke herself in the hospital. Dr. Yuan further testified that respondent's functioning had deteriorated due to her preoccupation with the delusions, and that the delusions could be dangerous because respondent may act on them. Respondent, however, had not threatened anyone at Chicago-Read, and no cause existed to place her in restraints or administer emergency medication. Although generally cooperative, respondent refused to attend group therapy, and could not be convinced to take medication. Dr. Yuan deemed group therapy without medication to be inappropriate at this point.

¶ 13 Dr. Yuan additionally testified regarding the primary medications he sought to administer, potential side effects, dosing, and the tests necessary for safe administration of the medication. Dr. Yuan opined that respondent lacked the capacity to make a reasoned decision about the treatment, and that the benefits of the treatment outweighed the harm.

¶ 14    At one point during Dr. Yuan's testimony, a short recess was taken after an interruption by respondent. The court noted on the record that "[r]espondent was speaking in a voice that was much deeper than her voice that she spoke in her earlier interruptions to the Court."

¶ 15    Respondent testified on her own behalf. At the time of the hearing, she was 51 years old and for the last 15 years had operated a daycare center in her home. Due to the economy and a loss of clientele, respondent closed her business in April 2011 and filed for bankruptcy. She sought general assistance through Evanston Township, became a member of Illinois WorkNet, and joined several community boards. The Community Economic Development Board nominated her as its treasurer in 2011.

¶ 16    Respondent also testified that she had problems with her memory, so she initiated a sequence of events that, in January 2011, led her to Dr. Singleton, a neurologist at Stroger Hospital. Respondent last saw Dr. Singleton in July 2011, and testified that she would like to be under his care.

¶ 17    Respondent further testified that beginning in October 2010, she had filed nine reports against 125 members of her church with the Illinois Attorney General, the Chicago police department, the Federal Bureau of Investigation, and the Evanston police department. In the reports she alleged assault, harassment, and stalking by church members.

¶ 18    When questioned about the gun she had tried to obtain, respondent explained that she had initiated, but had not completed, the process of obtaining firearm training and a gun license. Respondent testified that she was aware that it is illegal in this state to have a gun on the street. Her intention was to have a gun in her home, securely locked away. She "wasn't thinking of taking matters into her own hands."

¶ 19    With respect to the gasoline and turpentine that Mayjourio testified he found in her home, respondent explained that the driveway had been resurfaced and a technician from Home Depot told her that the tar-based material could only be cleaned off of utensils with gasoline, which is what she used.

¶ 20    As to the incident immediately preceding her hospitalization, respondent testified: "They [the voices] told him [Mayjourio] that they killed me." Respondent also indicated that she hit Mayjourio that day because he hurt her when he restrained her.

¶ 21    Respondent further testified that she had never been hospitalized at a mental health facility, and had never taken any of the medications Dr. Yuan sought to administer. According to respondent, Dr. Yuan had seen her only three or four times during the month preceding the hearing. On cross-examination, when asked whether the church members had spiritually raped her, respondent answered: "Exactly."

¶ 22    After closing arguments, the trial court granted the petition for involuntary medication of respondent. The court stated: "The testimony is overwhelming[ly] in support of the State's petition. All three witnesses and all the observations of the Court made in open court today so I am going to grant the petition."

¶ 23    The trial court's written order tracked section 2-107.1(a-5)(4) of the Mental Health Code, which sets forth several factors that must be proven by clear and convincing evidence. See 405 ILCS 5/2-107.1(a-5)(4) (West 2010). The written order stated, *inter alia*, that respondent has a

serious mental illness/developmental disability; respondent exhibits deterioration in her ability to function, suffering, or threatening or disruptive behavior; respondent has refused to submit to treatment by psychotropic medication; the benefits of the treatment outweigh the harm; respondent lacks the capacity to make a reasoned decision about the treatment; and other less restrictive services were explored and found inappropriate. The written order also detailed the primary and alternative medications and dosages, the tests necessary to safely and effectively administer the treatment, and the maximum treatment period of 90 days.

¶ 24    Respondent did not ask the trial court to make specific findings of fact on the record, and did not seek clarification of the trial court's oral or written ruling. Respondent, however, did file a notice of appeal, seeking reversal of the trial court's treatment order. Respondent argued that section 3-816(a) is a mandatory provision, and that the trial court's failure to strictly follow this provision, by making findings of fact on the record, rendered its order erroneous and of no effect. Respondent conceded that her appeal was rendered moot by the expiration of the 90-day treatment period, but argued that the case fell within all three recognized exceptions to the mootness doctrine: the collateral consequences exception, the public interest exception, and the capable-of-repetition-yet-avoiding-review exception. The State disputed that review was appropriate under any exception to the mootness doctrine, but argued that even if review was proper, section 3-816(a) was merely directory, not mandatory, and thus noncompliance did not require reversal of the trial court's order.

¶ 25    The appellate court reviewed the case under the collateral consequences exception to the mootness doctrine, and agreed with respondent that because section 3-816(a) is a mandatory provision, the appropriate remedy for noncompliance is reversal. 2013 IL App (1st) 112837, ¶¶ 10-11, 18-22.

¶ 26    We allowed the State's petition for leave to appeal (Ill. S. Ct. R. 315(a) (eff. July 1, 2013)), and allowed Mental Health America of Illinois to file an *amicus curiae* brief in support of respondent (Ill. S. Ct. R. 345 (eff. Sept. 20, 2010)).

¶ 27                                  ANALYSIS
¶ 28                                  I. Mootness
¶ 29    No dispute exists that respondent's appeal to the appellate court was rendered moot by the expiration of the 90-day treatment period. See *In re Robert S.*, 213 Ill. 2d 30, 45 (2004). The appellate court, however, noted that respondent had not been previously subject to involuntary treatment, and that the collateral consequences exception to the mootness doctrine "applies to a first involuntary-treatment order." 2013 IL App (1st) 112837, ¶ 10 (citing *In re Linda K.*, 407 Ill. App. 3d 1146, 1150 (2011)).

¶ 30    The State argues that, contrary to the appellate court's opinion, no *per se* exception to the mootness doctrine applies to first involuntary treatment orders, or mental health cases generally, and that the appellate court should have dismissed respondent's appeal as moot. The State requests that we vacate the appellate court's judgment. See *In re Commitment of Hernandez*, 239 Ill. 2d 195, 205 (2010) (vacating appellate court judgment where the appeal

before that court was moot). Whether the appellate court's mootness determination is correct is an issue of law which we review *de novo*. *In re Alfred H.H.*, 233 Ill. 2d 345, 350 (2009).

¶ 31    In *Alfred H.H.*, we held that the collateral consequences exception to the mootness doctrine is applicable in mental health cases. *Id.* at 362. Under this exception, where collateral consequences survive the expiration or cessation of a court order that are likely to be redressed by a favorable judicial determination, appellate review is permissible. *Id.* at 361. Although we recognized that reversal of a mental health admission or treatment order could provide a "host of potential legal benefits," we concluded that application of the collateral consequences exception "is still decided on a case-by-case basis." *Id.* at 362. When we considered the facts of the specific case before us, in which the respondent challenged an involuntary commitment order, we determined that no collateral consequences existed that would warrant application of this mootness exception. We explained:

> "[R]espondent has had multiple involuntary commitments prior to the present case. In addition, respondent is a felon who has served a sentence for murder. Simply stated, there is no collateral consequence that can be identified that could stem solely from the present adjudication. Every collateral consequence that can be identified already existed as a result of respondent's previous adjudications and felony conviction." *Id.* at 363.

¶ 32    In *Alfred H.H.* we also rejected the respondent's invitation to adopt a new exception to the mootness doctrine applicable to all civil commitment proceedings. *Id.* We stressed that "the evaluation of the established mootness exceptions must be conducted on a case-by-case basis," and that "[t]his evaluation must consider all the applicable exceptions in light of the relevant facts and legal claims raised in the appeal." *Id.* at 364.

¶ 33    Despite our clear statements in *Alfred H.H.* that application of the collateral consequences exception is decided on a case-by-case basis, even in cases arising under the Mental Health Code, some appellate court opinions have adopted the view that a first involuntary admission order or, as in this case, a first involuntary treatment order, is automatically reviewable under the collateral consequences exception. *E.g.*, *Linda K.*, 407 Ill. App. 3d at 1150 (" 'collateral-consequences exception applies to a first involuntary-treatment order' " (quoting *In re Joseph P.*, 406 Ill. App. 3d 341, 346 (2010))); *In re Wendy T.*, 406 Ill. App. 3d 185, 189 (2010) (applying collateral consequences exception where the "record does not indicate that respondent has ever before been subject to an order for the involuntary administration of medication," and "[t]hus, there are collateral consequences that might plague respondent in the future"); *In re Val Q.*, 396 Ill. App. 3d 155, 159-60 (2009) ("this being respondent's first involuntary treatment order, there are collateral consequences that may plague respondent in the future"); *In re Gloria C.*, 401 Ill. App. 3d 271, 275 (2010) ("this being the respondent's first involuntary admission order, there are collateral consequences that may plague the respondent in the future").

¶ 34    Application of the collateral consequences exception cannot rest upon the lone fact that no prior involuntary admission or treatment order was entered, or upon a vague, unsupported statement that collateral consequences might plague the respondent in the future. Rather, a reviewing court must consider all the relevant facts and legal issues raised in the appeal before

deciding whether the exception applies. *Alfred H.H.*, 233 Ill. 2d at 364. Collateral consequences must be identified that "could stem solely from the present adjudication." *Id.* at 363. Although *amicus curiae* argues that a first involuntary commitment or treatment order should always satisfy the collateral consequences exception, we adhere to our decision in *Alfred H.H.* and decline to adopt a blanket rule of appealability in such cases. Appellate court opinions that hold otherwise, including the opinion below, are overruled.

¶ 35     The State maintains that respondent here cannot identify any collateral consequences that stem solely from the trial court's involuntary treatment order. We need not consider this issue because we agree with respondent that even if the collateral consequences exception does not apply, review was nonetheless appropriate under the public interest exception.

¶ 36     Review of an otherwise moot issue under the public interest exception requires a clear showing of each of the following criteria: "(1) the question presented is of a public nature; (2) an authoritative determination of the question is desirable for the future guidance of public officers; and (3) the question is likely to recur." *In re Shelby R.*, 2013 IL 114994, ¶ 16. With respect to the first criterion, case-specific inquiries, such as sufficiency of the evidence, do not present the kinds of broad public issues required for review under the public interest exception. *Alfred H.H.*, 233 Ill. 2d at 356-57. Here, however, the issue before the appellate court was not case-specific. Rather, the issue was one of general applicability to mental health cases, involving the proper construction of section 3-816(a) as either a mandatory or directory provision. The resolution of this issue will affect the procedures that must be followed in proceedings under the Mental Health Code, which this court has already acknowledged are "matters of a public nature and of substantial public concern." *In re Mary Ann P.*, 202 Ill. 2d 393, 402 (2002). Accordingly, the first criterion for review under the public interest exception was satisfied.

¶ 37     With respect to the second criterion, the need for an authoritative determination of the question, we consider the state of the law as it relates to the moot question. See *Shelby R.*, 2013 IL 114994, ¶ 19. Research discloses that at the time respondent filed her notice of appeal, this court had not spoken on section 3-816(a) of the Mental Health Code. Our appellate court, however, had published three decisions, all arising in the Fifth District, involving a trial court's deviation from the fact-finding requirement of section 3-816(a). See *In re James S.*, 388 Ill. App. 3d 1102 (2009); *In re Lance H.*, 402 Ill. App. 3d 382 (2010); *In re Joseph M.*, 405 Ill. App. 3d 1167 (2010). In each of these cases, the appellate court reversed the trial court's treatment or admission order. None of these appellate opinions, however, addressed the specific issue raised in this case: whether section 3-816(a) is mandatory or directory. Accordingly, we regard the issue raised in this case as one of first impression which, as a matter of substantial public concern, is in need of an authoritative determination. See *Shelby R.*, 2013 IL 114994, ¶¶ 20-22 (holding that appellate court could properly consider issue of first impression under the public interest exception).

¶ 38     The desirability of an authoritative determination of this issue is also demonstrated by the inconsistent positions adopted by the State's Attorney of Randolph County in *Lance H.*, and the State's Attorney of Cook County in the instant case. In *Lance H.*, the State conceded that the trial court's failure to follow section 3-816(a) required reversal of the trial court's order.

*Lance H.*, 402 Ill. App. 3d at 386-87. Here, however, the State maintains that because the statute is directory, not mandatory, reversal is not required. Under these circumstances, the appellate court here could have reasonably concluded that review is desirable for the future guidance of public officers, thus satisfying the second criterion for application of the public interest exception.

¶ 39    Finally, with respect to the third criterion, no doubt exists that the question is likely to recur because section 3-816(a), by its express terms, applies to "[e]very final order" entered in proceedings under the Mental Health Code. 405 ILCS 5/3-816(a) (West 2010). We note that the State maintained, in its petition for leave to appeal, that the issue is "frequently raised in appeals involving involuntary commitment and medication orders." Although this statement was made in support of review by *this* court, it is equally applicable to review by the appellate court. That the issue is likely to recur is borne out by the fact that, just six months after entry of the appellate court opinion in this case, the appellate court was again called upon to consider whether section 3-816(a) is directory or mandatory. See *In re Latoya C.*, 2013 IL App (1st) 121477, ¶ 14, *pet. for leave to appeal pending*, No. 116555. The recurrence of this issue indicates that guidance in this area is still needed. *In re Laura H.*, 404 Ill. App. 3d 286, 289 (2010).

¶ 40    We conclude that the appellate court could have properly reviewed this case pursuant to the public interest exception to the mootness doctrine. Accordingly, we decline the State's invitation to vacate the appellate court opinion, and will consider the case on the merits. See *Shelby R.*, 2013 IL 114994, ¶ 23 ("For the same reasons that review by the appellate court was appropriate, review by this court is also appropriate.").

¶ 41                                   II. Mandatory Versus Directory

¶ 42    Section 3-816(a) of the Mental Health Code provides, in relevant part, that "[e]very final order entered by the court under this Act shall be in writing and shall be accompanied by a statement on the record of the court's findings of fact and conclusions of law." 405 ILCS 5/3-816(a) (West 2010). The involuntary treatment order entered in this case qualifies as a "final order." See *In re Curtis B.*, 203 Ill. 2d 53, 59 (2002) ("[a] final order is one which sets or fixes the rights of a party"). Further, because the State conceded that the trial court failed to comply with section 3-816(a), we will not make an independent determination of that issue. Accordingly, the only question before us is whether section 3-816(a) is mandatory, as the appellate court held, or directory, as the State argues.

¶ 43    "Whether a statutory command is mandatory or directory is a question of statutory construction, which we review *de novo*." *People v. Robinson*, 217 Ill. 2d 43, 54 (2005). The answer to this question is a matter of legislative intent. *Id.* As this court has explained:

> "[S]tatutes are mandatory if the intent of the legislature dictates a particular consequence for failure to comply with the provision. [Citation.] However, in the absence of such legislative intent the statute is directory and no particular consequence flows from noncompliance. [Citation.] There are consequences to a directory reading, but a directory reading acknowledges only that no *specific* consequence is triggered by

- 9 -

the failure to comply with the statute. [Citation.] In other words, the mandatory/directory question simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates. [Citation.]" (Emphasis in original.) (Internal quotation marks omitted.) *In re M.I.*, 2013 IL 113776, ¶ 16.

¶ 44 The law presumes that statutory language that issues a procedural command to a government official indicates an intent that the statute is directory. *Id.* ¶ 17. This presumption may be overcome, and the provision will be read as mandatory, under either of two conditions: (1) when the statute contains language prohibiting further action, or indicating a specific consequence, in the case of noncompliance, or (2) when the right or rights the statute was designed to protect would generally be injured by a directory reading. *Id.* ¶¶ 17-18.

¶ 45 With respect to the first condition, section 3-816(a) lacks any language that would prohibit the entry of a final order, or language identifying a specific consequence, for noncompliance with the statutory command. Although section 3-816(a) states that final orders "shall" be accompanied by findings of fact, the word "shall" is not determinative when the mandatory/directory dichotomy is at issue. *Id.* ¶ 19. Thus, the first condition which would overcome the presumption that section 3-816(a) is directory is not present here.

¶ 46 With respect to the second condition, the parties have identified three rights which one or both of them claim section 3-816(a) is intended to protect: (1) a respondent's appeal rights; (2) a respondent's liberty interest in refusing treatment; and (3) a respondent's right to notice of the trial court's reasoning. We consider each in turn.

¶ 47                                   III. Appeal Rights

¶ 48 The Mental Health Code provides that "[a]n appeal from a final order may be taken in the same manner as in other civil cases." 405 ILCS 5/3-816(b) (West 2010). The State and respondent agree that section 3-816(a) is intended to protect this statutory right, but disagree as to whether a directory reading of the statute would generally injure that right.

¶ 49 Respondent makes no claim that the trial court's noncompliance with section 3-816(a) injured her appeal rights in this case. Instead, she argues that in other cases, a lack of fact-finding could, as a practical matter, preclude appellate review. In support of this argument, respondent directs our attention to section 2-107.1 of the Mental Health Code, which sets forth several factors that must be proven by clear and convincing evidence before a court may authorize involuntary treatment. 405 ILCS 5/2-107.1(a-5)(4) (West 2010). One such factor is that the respondent currently exhibits one of the following: "(i) deterioration of his or her ability to function ***, (ii) suffering, or (iii) threatening behavior." 405 ILCS 5/2-107.1(a-5)(4)(B) (West 2010). Respondent argues that if, for example, the trial court failed to make a finding as to which behavior it found had been proven, the court on appeal would not be able to review whether the court's decision was against the manifest weight of the evidence.

¶ 50 Although a clear recitation of the trial court's findings of fact would be helpful to a reviewing court (see *In re Madison H.*, 215 Ill. 2d 364, 374 (2005)), we agree with the State

that a full and fair review of the trial court's ruling is not precluded by a lack of factual findings. We note that reviewing courts frequently consider sufficiency of the evidence claims where, as here, the ultimate ruling, but not the underlying findings, is disclosed. Appeal from a judgment entered on a jury verdict is a prime example. The reviewing court knows only the jury's verdict, not the underlying findings supporting the verdict. Yet that circumstance does not preclude a reviewing court from considering a sufficiency-of-the-evidence claim. We note, also, that not all appeals in cases arising under the Mental Health Code implicate the trial court's fact-finding. A respondent may raise a purely legal issue on appeal whose resolution is not dependent upon the trial court's factual findings, or challenge a legal conclusion flowing from a set of undisputed facts. Indeed, in this case, respondent has raised only a legal issue on appeal, and has not challenged the sufficiency of the evidence supporting the trial court's treatment order.

¶ 51    Our conclusion that a lack of factual findings does not preclude appellate review also finds support in the principle that it is the "judgment" of the lower court that is reviewed, and "not what else may have been said." *In re Estate of Funk*, 221 Ill. 2d 30, 86 (2006). Thus, although factual findings may provide an explanation or reason for the trial court's decision, it is the correctness of the court's ruling, and not the correctness of its reasoning, that is under review. *People v. Johnson*, 208 Ill. 2d 118, 128 (2003).

¶ 52    Because no reason has been identified from which we may conclude that an injury to respondent's appeal rights would generally result from a directory reading of the statute, the presumption that section 3-816(a) is directory has not been overcome. See *Robinson*, 217 Ill. 2d at 57 (rejecting mandatory reading of statute where, although the right to appeal might be injured "in a given case, there is no reason to believe that it generally would be").

¶ 53                                IV. Liberty Interest

¶ 54    Respondent argues that section 3-816(a) must be given a mandatory reading in light of the " 'massive curtailment of liberty' " that the administration of involuntary mental health services entails. *In re Barbara H.*, 183 Ill. 2d 482, 496 (1998) (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)). According to respondent, requiring a trial court to make factual findings on the record reminds courts to follow the law, rather than simply rubber-stamping a psychiatrist's recommendation, or ordering mental health services for well-intentioned, but improper reasons.

¶ 55    The State does not directly challenge respondent's assertion that section 3-816(a) is intended to protect the liberty interests of recipients of mental health services. The State argues, however, that the procedures utilized in this case fully protected respondent's liberty interests, and other than her assertion that the trial court failed to make the findings required by section 3-816(a), respondent has never claimed that her liberty interests were infringed or that the trial court's order was improper.

¶ 56    Our task is to determine whether a directory reading of section 3-816(a) would generally injure a right the statute was intended to protect. *M.I.*, 2013 IL 113776, ¶ 17. If we accept respondent's argument, then we must conclude that a directory reading will generally injure a

respondent's liberty interest because trial courts will likely not follow the law, will probably rubber-stamp the psychiatrist's recommendation, and will order mental health services for the wrong reasons. Such a conclusion is not warranted.

¶ 57    This court has recognized that persons who are mentally ill have a federal constitutionally protected liberty interest to refuse the administration of psychotropic medication. *In re C.E.*, 161 Ill. 2d 200, 214 (1994). The State, however, has a legitimate *parens patriae* interest, embodied in section 2-107.1 of the Mental Health Code, in furthering the treatment of the mentally ill, by forcibly administering treatment to those individuals incapable of making a sound decision. *Id.* at 217.

¶ 58    Pursuant to section 2-107.1(a-5)(1), before a trial court may enter an involuntary medication order, a petition must first be filed in the circuit court and delivered to the respondent, his or her attorney, and his or her guardian, if any, along with notice of the time and place of the hearing. 405 ILCS 5/2-107.1(a-5)(1) (West 2010). The petitioner must make a good faith attempt to determine whether the respondent has executed a power of attorney for health care or a declaration for mental health treatment. *Id.* Significantly, the respondent is entitled to appointment of counsel. 405 ILCS 5/2-107.1(a-5)(3), 3-805 (West 2010); *Barbara H.*, 183 Ill. 2d at 493-94. Only in limited circumstances will a hearing proceed without counsel. 405 ILCS 5/3-805 (West 2010). The respondent is also entitled to secure an independent examination by a physician, clinical psychologist, or other expert of respondent's choice (405 ILCS 5/2-107.1(a-5)(3), 3-804 (West 2010)), and must receive written notice of the side effects, risks, and benefits of the treatment plan (405 ILCS 5/2-102(a-5) (West 2010)).

¶ 59    At the judicial hearing on the petition, which is separate from the hearing to determine if the respondent is subject to involuntary admission (405 ILCS 5/2-107.1(a-5)(2) (West 2010)), the presence of the following factors must be proven by clear and convincing evidence:

> "(A) That the recipient has a serious mental illness or developmental disability.
>
> (B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.
>
> (C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) *** or the repeated episodic occurrence of these symptoms.
>
> (D) That the benefits of the treatment outweigh the harm.
>
> (E) That the recipient lacks the capacity to make a reasoned decision about the treatment.
>
> (F) That other less restrictive services have been explored and found inappropriate.
>
> (G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2-107.1(a-5)(4) (West 2010).

If the petition is granted, the court's written order, which can be effective for no more than 90 days (405 ILCS 5/2-107.2(a-5)(5) (West 2010)), must identify the medications, along with the anticipated dosages, and the persons authorized to administer them (405 ILCS 5/2-107.2(a-5)(6) (West 2010)).

¶ 60    A directory reading of section 3-816(a), under which noncompliance could be excused, does not negate these procedural safeguards. Indeed, respondent does not argue that the procedures followed in this case—a hearing, after notice, at which respondent was represented by counsel, and had an opportunity to challenge the State's evidence—were compromised because the court expressed only its legal conclusion that the evidence overwhelmingly supported the petition. We cannot make the leap, urged by respondent, that a directory reading will injure the liberty interests the foregoing procedures protect by somehow enabling trial courts to rubber-stamp a psychiatrist's recommendation or authorize administration of psychotropic drugs for improper reasons. Accordingly, we decline to depart from the legal presumption that section 3-816(a) is directory.

¶ 61                        V. Right to Notice of the Trial Court's Reasoning

¶ 62    Respondent also argues that a directory reading of section 3-816(a) will generally injure a respondent's "right to notice of the trial court's reasoning." The State disputes that such a right exists. The State further argues that, in any event, the notice respondent claims is due could have been realized had she simply requested specific findings of fact, or other clarification, at the time the trial court ruled, and that no reason exists to reverse the trial court's judgment. See *In re Nau*, 153 Ill. 2d 406, 419 (1992) (holding that reversal of commitment order was not required based on a defect in notice under section 3-611 of the Mental Health Code, where the defect "could and should have been objected to immediately, could have been easily cured if timely objected to, and made no difference anyway" (internal quotation marks omitted)).

¶ 63    We first consider the source of respondent's claimed "right to notice of the trial court's reasoning." Respondent does not argue that such right flows from section 3-816(a) or any other statutory provision. Rather, respondent relies on this court's opinion in *Madison H.*

¶ 64    *Madison H.* involved an appeal following a dispositional hearing under the Juvenile Court Act, in which guardianship of the minor child was placed in the Department of Children and Family Services. At issue was a provision of the Juvenile Court Act, stating that "[i]f the trial court determines and puts in writing" its factual basis for finding the parents unable to care for the child, and that the child's best interests will be jeopardized if the child remains with the parents, the court may commit the minor to the Department of Children and Family Services. 705 ILCS 405/2-27(1) (West 2002). We remanded the case to the trial court to make specific findings of fact apprising the child's mother (who was developmentally disabled) of the reasons for the trial court's decision. *Madison H.*, 215 Ill. 2d at 377-78. As emphasized in the special concurrence, written findings were necessary "to provide the parties, social services, and the court with clear benchmarks for measuring future progress toward the goal of reunification." *Id.* at 380 (Kilbride, J., specially concurring).

¶ 65   The present case does not involve a provision of the Juvenile Court Act, nor does it involve an ongoing proceeding in which the trial court's findings are intended to provide benchmarks for the respondent's conduct. Moreover, *Madison H.* did not consider the mandatory/directory dichotomy that is now before us. Though *Madison H.* established the favored procedure in certain abuse and neglect cases, it did not establish a broadly applicable "right to notice of the trial court's reasoning."

¶ 66   Respondent identifies no other source of her right to such notice. Instead, respondent generally maintains that notice of the trial court's reasoning will protect her liberty interest in not being medicated involuntarily, just as statutory notice of the medication and its side effects will protect her liberty interest. Thus, respondent's right-to-notice argument devolves into a liberty-interest argument. As already discussed, however, we rejected respondent's argument that a directory reading of section 3-816(a) will generally injure her liberty interests. Accordingly, we also reject respondent's right-to-notice argument as a basis on which to depart from a directory reading of section 3-816(a).

¶ 67                              CONCLUSION

¶ 68   Having found no reason to conclude that a respondent's appeal rights or liberty interests will generally be injured through a directory reading of section 3-816(a), we hold that the legal presumption that section 3-816(a) is a directory provision has not been overcome in this case, and that the appellate court erred in reversing the judgment of the trial court. Accordingly, we reverse the judgment of the appellate court and affirm the judgment of the trial court.

¶ 69   Appellate court judgment reversed.

¶ 70   Circuit court judgment affirmed.