NOTICE
Decision filed 12/28/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200182-U

NO. 5-20-0182

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* ESTATE OF CHRISTOPHER DYLAN HILL, a Disabled Adult | ) ) ) | Appeal from the Circuit Court of Saline County. |
| (David Mitchell, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 19-P-66 |
| Shirley Ann Hill, | ) ) | Honorable Todd D. Lambert, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the trial court's decision to appoint the Office of State Guardian where no other person was available and willing to accept the guardianship appointment.

¶ 2   Shirley Ann Hill (Mother) appeals the judgment of the circuit court of Saline County granting David Mitchell, Adult Protective Services, Unit Director, Shawnee Alliance, (Shawnee Alliance) guardianship of the person of Christopher Dylan Hill. Mother claims that the circuit court failed to make specific findings as required by section 31 of the Guardianship and Advocacy Act (20 ILCS 3955/31 (West 2020)). We affirm.

1

¶ 3                    I. BACKGROUND

¶ 4     Christopher Dylan was born on May 5, 2000. His mother is Shirley Ann Hill (Mother), and his sister is Misty Hill (Sister). Christopher suffers from autistic disorder, impulse control disorder, profound intellectual disability, developmental delays, leukodystrophies syndrome, chronic constipation, asthma, incontinence, weight loss, and failure to thrive. He is essentially nonverbal, unable to perform self-care, and requires 24-hour supervision and care.

¶ 5     On December 3, 2019, Shawnee Alliance, the local agency designated to prevent abuse, neglect, and financial exploitation of adults with disabilities, filed a petition for guardianship as to Christopher. Attached to the petition were two physician's reports and medical records. The physician's reports did not identify Christopher by name as the physicians did not fill in the "patient's name" on the forms. The petition requested that the trial court appoint the Office of State Guardian (OSG) as Christopher's guardian because no other individual was suitable and willing to accept the appointment. Mother and Sister were listed on the petition as Christopher's nearest known adult relatives. Shawnee Alliance additionally filed a petition for temporary guardianship and a letter that listed counsel's availability for a temporary hearing date. The petition for temporary guardianship requested that the trial court appoint OSG as temporary guardian.

¶ 6     An updated physician's report that identified Christopher as the patient was filed on December 10, 2019, the date of the temporary guardianship hearing. According to the physician's report, Christopher was totally dependent and required 24-hour care and supervision. Christopher's physician additionally recommended placement in a group home.

¶ 7     The trial court held a hearing on the petition for temporary guardianship without Mother's presence. Kimberly Cremer, an investigator with Adult Protective Services (APS), testified that Christopher was not receiving proper care with Mother. Mother had "a great deal of mental health

issues." Christopher lost over 30 pounds in two years. Cremer recommended a facility in Eldorado, Illinois, through Southeastern Residential Alternatives (SRA) that would provide a Community Integrated Living Arrangement (CILA) for Christopher. Christopher would be able to remain at his school while living in that facility.

¶ 8    The trial court found that Christopher had severe autism and a profound developmental delay; that a guardian of the estate was unnecessary; that residential placement with 24-hour care was necessary; and that the appointment of the OSG was necessary because there was "no other individual suitable and willing to accept appointment." The court appointed the OSG as the temporary guardian of the person of Christopher. Shawnee Alliance was authorized to immediately arrange for the transfer of Christopher to an appropriate residential or medical facility. Mother was ordered to refrain from interfering with his transfer.

¶ 9    Shawnee Alliance requested that the court appoint a guardian *ad litem* (GAL). On December 23, 2019, the court appointed Rebecca Whittington as the GAL.

¶ 10    Mother filed a *pro se* petition for appointment of a guardian for an adult with disabilities on January 6, 2020, in this case. Her petition stated that Christopher needed a guardianship so that he could live with his family and have stability. Sister did not file any pleadings.

¶ 11                              A. GAL Report

¶ 12    On January 28, 2020, the GAL filed an 18-page report and recommendation detailing Christopher's medical issues and listing concerns of abuse and neglect while in Mother's care. Christopher had a 10-word vocabulary and was "essentially non-verbal." Dr. William Donaldson had administered the Slosson Intelligence Test on Christopher and Christopher was unable to comprehend or respond to any test questions. His mental age was assessed at one year and seven months. Christopher had an IQ of 12.

¶ 13    Christopher's weight had decreased in a "clinically-significant manner" in Mother's care. Christopher had never been "potty trained," and he would not regularly bathe or shower. He suffered from frequent gaulding of his genitals and pelvic area. Christopher's teeth appeared as if they had not been brushed for months. His hair and beard were "over-grown, unwashed, matted, stinking, and filthy." "Feces was found packed under fingernails" and his fingernails were "ragged" and "curled." When Christopher was removed from Mother's care, the pill count on his prescriptions was incorrect.

¶ 14    Mother appeared to be a hoarder and her house had been without water and sewer for a "lengthy period of time." The GAL was concerned about Mother's claim that Luther Coleman lived under their home in a crawl space. According to Mother, Luther had cut through her floorboards to enter the home. Luther would torment everyone, and he sodomized Christopher. Mother had obtained an order of protection against Luther in 2017, which did not list Christopher as a protected party. See Hill v. Coleman, No. 17-OP-86 (Cir. Ct. Saline County, June 22, 2017). The GAL did not provide an opinion on whether Mother's reports of abuse from Luther had actually occurred. The GAL, however, noted that Christopher's physician considered Mother to be "delusional."

¶ 15    The GAL report additionally identified issues with Sister. Sister appeared to have a mental illness. She was a "cutter" and had "suicidal ideations." Sister had also stolen a check from Christopher.

¶ 16    After Christopher was removed from Mother's care, he was placed in a CILA through SRA. He quickly gained weight. The gaulding stopped. He learned to respond to prompts to brush his teeth and was working on using mouth wash. Christopher's face and hair were shaved, and his nails were trimmed. After his medications were properly administered, Christopher's behavior

4

became more compliant, interactive, and responsive. Christopher had learned how to spell his name, count five pennies, and he orally interacted with CILA staff members.

¶ 17 The GAL recommended that the court deny Mother's counterpetition and that the OSG should receive plenary guardianship of Christopher. The GAL opined that Shawnee Alliance would be able to present evidence that "no family member has historically been able to provide a plan of care that meets statutory requirements." Christopher was receiving a plan of care through SRA that was in Christopher's best interests.

¶ 18             B. Hearing on Petition for Guardianship—January 31, 2020

¶ 19 On January 31, 2020, the court considered Mother's petition as a counterpetition for guardianship. The court held a hearing on both the petition for guardianship and Mother's counterpetition. Mother and Sister were present for the hearing. The hearing began with Shawnee Alliance calling Mother as an adverse witness. Mother identified herself and Sister as Christopher's only family. They lived together in a house in Harrisburg, Illinois.

¶ 20 Mother testified to the care that Christopher received at her home. Christopher showered every two days, his teeth were brushed three times a day, and she trimmed his nails when he "got his bath." The sewer line at Mother's house had recently clogged. They were unable to take showers for three days, until Roto-Rooter fixed the problem. Christopher was a picky eater, and she would feed him bologna, corn dogs, or hot dogs. Mother was aware of Christopher's weight loss. Mother would change Christopher's adult diapers when he requested. She had taught Christopher to put his dirty clothes in the laundry and get food when he wanted to eat. She estimated that she would watch Christopher three hours on days when he was in school. Christopher frequently missed school due to severe constipation.

¶ 21    Mother testified that she was bipolar and an insomniac. Sister had mental health problems as well, but Mother did not testify to a specific diagnosis. Luther Coleman assisted in caring for Christopher about a decade ago. Mother fired Luther because she suspected that he had sexually molested Christopher. Mother testified that she had previously obtained an order of protection against Luther because he would come through a trap door to sexually molest Christopher. No one had observed the trap doors in her house. Mother believed that Luther had returned and had "dug his way under [her] foundation and was in like a five-foot hole and had a dog."

¶ 22    Mother additionally testified that if the court appointed her as Christopher's guardian, she planned to keep Christopher in school until he turned 22 years old. She wanted Christopher to work towards being able to live at an independent living facility.

¶ 23    Kimberly Cremer, an investigator with APS, testified that she had been familiar with Christopher Hill since July of 2019, when she began her investigation. Cremer had been to Mother's house on several occasions. Cremer described an instance where Mother had refused to allow Cremer inside of her home because Mother believed that Luther was listening.

¶ 24    Cremer testified that there was "a lot of hoarding" and "clutter" inside Mother's home. Cremer explained that boxes were stacked above her head, and she was 5 feet, 4 inches tall. There was only a foot and a half wide pathway to walk between the clutter. Mother had moved Christopher's bed into her bedroom "to keep him safe." The bedroom was filled with stacked boxes and bags. The cabinets throughout the house were padlocked. The kitchen was dirty, and the house had a "musty odor." Cremer was aware of the sewer problems in Mother's house. A Roto-Rooter employee told Cremer that Mother had been without an operating sewer in one bathroom for over a month. Cremer did not believe the home was safe for Christopher.

6

¶ 25    On multiple visits, Mother told Cremer about the abuse Luther allegedly inflicted. Mother's story was inconsistent. Mother claimed that Luther abused Christopher with a pistol and a shotgun. He would come through the floor through trap doors. Mother had also claimed that Luther would take antifreeze from Mother's car and put it in Christopher's Kool-Aid.

¶ 26    Cremer had met with Christopher multiple times. At home, Christopher typically wore an adult diaper and a shirt, or only a diaper. At school, Christopher wore sweatpants, a t-shirt, and shoes. He was sent to school in dirty clothes, but his hands and face were clean at school.

¶ 27    When Christopher was removed from Mother's care, his medications were found in a padlocked duffle bag. The bag had to be cut open. The medications were not accurate to the fill dates, indicating that Christopher's medication was not properly administered.

¶ 28    Cremer also testified to Christopher's progress after he was removed from Mother's home and placed at SRA. Christopher had gained weight. He was eating new foods. He had a haircut, was shaved, and had clean new clothes. He had not missed school.

¶ 29    Rosa Pack testified as the house manager for SRA. Pack testified that when Christopher arrived at the facility, he was thin with a scruffy beard, and he appeared to need a bath. He would not eat food at a table. He preferred finger foods because he could not use utensils.

¶ 30    After spending time at SRA, Christopher's appearance improved. He wore clean clothes, and his beard was shaved neatly. The SRA staff worked with Christopher to use utensils at every meal. Christopher learned to brush his own teeth. The SRA staff was working on teaching Christopher to shower on his own, but he did not feel comfortable. He also did not feel comfortable using the toilet. Christopher wore adult diapers full time. Christopher was also learning how to use the washing machine.

¶ 31 During cross-examination, Mother asked Pack why Mother was not allowed to visit Christopher. Pack responded that she had called Mother four times and Mother never answered. Shawnee Alliance then rested its case after Pack's testimony.

¶ 32 Rebecca Whittington, the GAL, informed the court that she had completed a report which did not need to be modified based on the evidence presented at the hearing. The GAL recommended that Christopher remain placed in the CILA, and that the OSG receive guardianship of Christopher. Mother asked the GAL why a home visit never occurred. The GAL testified that she went to Mother's house at the scheduled time and Mother did not answer the door.

¶ 33 Mother requested a continuance. She explained that she thought that the hearing was going to be about a dog that was living under her house with Luther. Mother believed that Christopher was going to be returned to her care after the dog was removed from her property. Shawnee Alliance objected to the continuance and argued that Mother had been served with the pleadings and she had an appropriate amount of time to prepare for the hearing. The trial court granted Mother's request for a continuance and extended the temporary guardianship.

¶ 34 C. Hearing on Petition for Guardianship—June 11, 2020

¶ 35 The hearing on the petition for guardianship resumed on June 11, 2020. The lengthy delay in scheduling was due to COVID-19. The court also held the hearing over a video conferencing platform due to COVID-19. At the start of the hearing, Shawnee Alliance requested to reopen its case to present further evidence of Christopher's progress since the prior hearing date. Mother could not hear the request. The trial court gave Mother the opportunity to appear in person and continued the hearing until 2 p.m. that afternoon. Mother, however, did not appear at 2 p.m. and the court proceeded without her.

¶ 36    Kelsey Borum had replaced Pack as the new SRA house manager. Borum testified that Christopher had missed approximately 60 days of school during the last semester he lived with Mother. The following semester, when Christopher lived at SRA, he missed eight days of school. Pack noticed an improvement with Christopher's interactions with people. He had stated the name of Veronica, a staff member, without prompting because he wanted her attention. Borum began testifying about progress made regarding Christopher's hygiene. Then, the trial court paused testimony because Mother appeared for the hearing.

¶ 37    Borum's testimony resumed after Mother was seated. Christopher had a Personal Centered Plan that included goals to shower, brush his teeth, do laundry, and eat on his own. When prompted, Christopher would get into the shower. Borum explained that Christopher "gets extra agitated when he's dirty or when he's just not feeling his best." He learned to brush his teeth on his own. Christopher learned to change his adult diaper during the night when necessary and take his dirty clothes to the laundry room. He ate fresh fruits, vegetables, nuts, and meat. His new diet helped with his constipation issues and Christopher had gained weight.

¶ 38    Cremer testified to Mother's behavior since the last hearing date. Mother had called Cremer multiple times and provided five new phone numbers. Cremer gave Mother the number to the OSG to arrange visitation with Christopher on three or four occasions. During their phone conversations, Mother shared information about herself and did not always ask about Christopher. Mother would tell Cremer that someone was living under her home, she had issues with identity theft, her phone was being tampered with, there were trap doors behind her stove, lumber was being delivered, and people wanted to use her house to manufacture methamphetamines.

¶ 39    The GAL questioned Cremer regarding Christopher's progress during the last six months. Cremer testified that Christopher had made "huge strides towards his maximum level towards

9

independence." Christopher could brush his teeth, take showers, and was eating new foods. He also appeared to be content at the facility.

¶ 40   Mother questioned Cremer about whether she had been honest about her testimony. Cremer stated that she "only reported what [she] had witnessed." Mother began to argue with Cremer and claimed that Cremer never provided a contact number for Christopher. Cremer stated that she had provided Mother with the number to OSG. The court ended Cremer's testimony after Mother was unable to form another question. Shawnee Alliance then rested its case.

¶ 41   The GAL offered to testify to the information set forth in her report. The court stated that it had reviewed the GAL's report and the GAL did not testify.

¶ 42   Mother then presented her case. Mother presented a doctor's report indicating that Christopher's weight on October 17, 2018, was 150 pounds. Mother offered an affidavit into evidence of a witness that was not available. Shawnee Alliance objected to the affidavit, and it was not admitted. Mother additionally presented photographs of her house and photographs of Christopher from when he was born through his adolescence. Mother had made handwritten notes on the photograph exhibits. The court allowed the photographs into evidence, but not the handwritten notes.

¶ 43   Mother then testified that a Roto-Rooter employee found Luther under her house with a pit bull. Mother stated that the musty smell identified by Cremer was probably sewer. Mother then claimed that she began to work with the FBI to remove Luther because she had found corpses under her home. The police did not want to assist her. She had taken photographs of the corpses and provided those photographs to the coroner. Mother also explained that she had multiple phones because Luther would hack her phones.

10

¶ 44 Mother would have to prompt Sister to care for Christopher. Sister would sometimes change Christopher's adult diapers and she would ignore rashes. Mother had to direct Sister to use ointment on Christopher's rashes. Mother claimed that Christopher's weight fluctuated because of medical issues. Christopher had performed the same activities at her house that he was doing in the facility. She believed that Christopher was loved at home, and not neglected.

¶ 45 Mother wanted guardianship of Christopher because she wished to be a part of Christopher's life. Mother planned on keeping Christopher at SRA until she was able to sell her house and move. Mother, however, did not want to move or for Christopher to return home until Luther was incarcerated.

¶ 46 On cross-examination, Mother was asked why she had called the coroner. Mother testified that she had taken the photographs of the corpses to the coroner. Mother said, "there was parts that were cut up. There was heads. There was a leg that he had put the barricade on and it was sticking up and you could see fluid in it and a sock on it, the ankle sock." After Mother had contacted the police department, Luther had made the "hole smaller so the coroner couldn't fit, but [she] could because [she] was small." The bodies had disappeared, and Mother did not know what Luther did with the bodies. Mother also claimed that she could hear Luther "sawing with a saw all hours of the night" so that Luther could sneak into her home and steal her bank cards.

¶ 47 Misty Hill, Sister, testified that she was 23 years old and lived with Mother. Sister was Christopher's personal assistant. She would bathe Christopher every Sunday, Wednesday, and Friday. Sister prepared meals, changed Christopher's clothes, and changed his diaper when necessary. She also administered Christopher's medicine. Sister testified that Christopher was always clean, and he would put his dirty clothes in the laundry room. Mother would get angry with Sister when Christopher would have a diaper rash. Mother rested her case after Sister's testimony.

11

¶ 48    Shawnee Alliance argued that Christopher needed a guardian. Christopher was unable to communicate his preference for a guardian due to his disability. The OSG should be appointed as Christopher's guardian because Mother had not provided a program of "active and suitable learning." Mother also had not protected Christopher from neglect and had not encouraged Christopher to be self-reliant. The physician's reports stated that Christopher required constant care and that a group home would be beneficial.

¶ 49    Mother argued that Christopher was in school under her care, and they were teaching him to be as independent as possible. Mother claimed that Christopher did not need "around the clock care." Christopher only required a guardian because he was unable to sign his name. Mother further argued that Christopher was doing well at home with her and that she would place him in a home when it was necessary. Mother then stated that she did not want Christopher at home with her at this time because "I've got that nut under there and I don't trust him around Chris." She asked the court to have the police remove Luther and shoot the dog so that Christopher could return home. Mother stated that when Christopher returned, she would share a room with him to protect him.

¶ 50    The GAL argued that Mother's testimony had shown an "inability to discern real conditions and needs and to adapt to programs of care." The GAL noted that she had indicated in her report a concern for Mother being an at-risk adult with a need for assistance or intervention. Mother was unable to provide care to meet Christopher's "basic needs of human decency and personal dignity."

¶ 51    Mother interjected and said, "I pray you give me guardianship." The court responded that Mother was not going to have guardianship of Christopher. The court found that Christopher was disabled as shown in the reports of the physicians. Christopher's physician recommended that he receive 24-hour-a-day care.

¶ 52    The court then considered whether Mother should be Christopher's guardian. When Christopher lived with Mother, he was dirty and not thriving. He lived in a home with hoarding and clutter. He frequently missed school. Mother had also provided delusional testimony that a person lived under her home, she had encounters with the FBI, and Mother had taken photographs of dead bodies under her home. The court found that Christopher was not in a safe place when he was at Mother's home.

¶ 53    The court then considered that Christopher had thrived in the CILA environment. He had learned to eat with a utensil, request showers, and he called people by name. Christopher did not like to be dirty. The court found that it was in Christopher's best interest to remain in the CILA, and that Shawnee Alliance had met their burden of proof. The court additionally found that OSG was "far better suited than any person before the Court to make appropriate decisions for Christopher." The court granted the petition and appointed the OSG as Christopher's guardian.

¶ 54    On June 29, 2020, the court entered a formal written order. The court determined that Christopher was a disabled person and without capacity to manage his person. The order included the finding that "[t]he counter-petitioner, who is the mother of the disabled adult[,] is delusional and her home is not a safe place for the disabled adult to reside, nor is she capable of providing an active and suitable program of guardianship for the disabled adult." Mother's counterpetition for guardianship had not been proven.

¶ 55    The court additionally found that Christopher thrived at the CILA where his physical and mental health needs were properly cared for, and he received an active and suitable program to develop independent living skills. The order included that "[t]he petitioner has [met] the burden of proof required for appointment of a guardian pursuant to statute, and the guardian needs to be the Office of State Guardian as it is best suited to be able to provide for the disabled adult's best

13

interest and well being." The OSG was appointed as the guardian of the person of Christopher. This appeal followed.

¶ 56                                II. ANALYSIS

¶ 57     On appeal, Mother argues that the trial court failed to make specific findings as required by section 31 of the Guardianship and Advocacy Act (20 ILCS 3955/31 (West 2020)), in support of its order appointing the Office of State Guardian (OSG). The trial court's final written order inadvertently omitted the exact language of section 31, "that no other suitable and willing person could be found to accept the guardianship appointment." 20 ILCS 3955/31 (West 2020).

¶ 58     In general, a trial court's decision as to whom is appointed as plenary guardian is reviewed for an abuse of discretion. *In re Guardianship of Burdge*, 2018 IL App (5th) 170317, ¶ 82. When resolving a question of statutory construction to determining whether a statutory command is mandatory or directory, however, we review *de novo*. *In re Rita P.*, 2014 IL 115798, ¶ 43.

¶ 59     The best evidence of legislative intent is the language in the statute. *People v. Robinson*, 217 Ill. 2d 43, 54 (2005). "[S]tatutes are mandatory if the intent of the legislature dictates a particular consequence for failure to comply with the provision." (Internal quotation marks omitted.) *In re Rita P.*, 2014 IL 115798, ¶ 43. Absent legislative intent, statutes are directory if "no specific consequence is triggered by the failure to comply with the statute." (Emphasis and internal quotation marks omitted.) *In re Rita P.*, 2014 IL 115798, ¶ 43.

¶ 60     A court will presume that statutory language issuing a procedural command to a government official is directory. *In re Rita P.*, 2014 IL 115798, ¶ 44. The word "shall" is not determinative. *Robinson*, 217 Ill. 2d at 54. The presumption that the procedural command is directory will be overcome if either of the following two conditions are present: "(1) when there is negative language in the statute prohibiting further action or indicating a specific consequence

14

in the case of noncompliance or (2) when the right the statute is designed to protect would generally be injured if a directory reading was given to the command." *In re L.O.*, 2016 IL App (3d) 150083, ¶ 20.

¶ 61    Section 31 commands the court to "indicate in the order appointing the guardian as a finding of fact that no other suitable and willing person could be found to accept the guardianship appointment." 20 ILCS 3955/31 (West 2020). Additionally, section 31 states that "the court shall also indicate in the order, as a finding of fact, the reasons that the State Guardian appointment, rather than the appointment of another interested party, is required." 20 ILCS 3955/31 (West 2020). Section 31 lacks language that would prohibit the entry of the final order or a specific consequence if those specific findings are not indicated in the final order.

¶ 62    Mother argues that the presumption that the command is directory should be overcome because Christopher's family was affected by the guardianship appointment. The order affected her rights as Christopher's Mother. The Guardianship and Advocacy Act, however, was enacted to safeguard the rights of disabled persons, and not Mother's. *Friendship Facilities, Inc. v. Region 1B Human Rights Authority*, 167 Ill. App. 3d 425, 430 (1988).

¶ 63    Mother also referred to section 11a-3 the Probate Act of 1975 (Probate Act) (755 ILCS 5/11a-3(b) (West 2020)) in her argument that the language required by section 31 is mandatory. Mother argues that guardianships are statutory and utilized only to promote the well-being of the person with a disability, to protect him from neglect, exploitation, or abuse, and to encourage development of his maximum self-reliance and independence. See 755 ILCS 5/11a-3(b) (West 2020).

¶ 64    The trial court had considered the petitions for guardianship filed pursuant to the Probate Act. The court found that Mother's counterpetition was not proven. A person is qualified to act as

guardian if the court finds that the person (1) is capable of providing an active and suitable program of guardianship for the person with a disability, (2) is at least 18 years old, (3) is a resident of the United States, (4) is of sound mind, and (5) has not been convicted of a felony, unless the statutory exceptions apply. 755 ILCS 5/11a-5 (West 2020). "[T]he paramount concern in the selection of the guardian is the best interest and well-being of the person with a disability." 755 ILCS 5/11a-12(d) (West 2020). In determining the best interest of the disabled person, the trial court may consider multiple factors in making its guardianship determination including:

> "(1) the degree of relationship between the disabled person and the proposed guardian; (2) the recommendations of persons with kinship or familial ties to the disabled person; (3) conduct by the disabled person prior to the adjudication demonstrating trust or confidence in the proposed guardian; (4) prior conduct by the proposed guardian indicating a concern for the well-being of the disabled person; (5) the ability of the proposed guardian to manage the disabled person's estate (the proposed guardian's business experience and other factors); and (6) the extent to which the proposed guardian is committed to discharging any responsibilities which might conflict with his or her duties as a guardian." *In re Estate of McHenry*, 2016 IL App (3d) 140913, ¶ 141.

¶ 65    The record supports the trial court's decision that Mother's counterpetition was not proven, as Mother was not capable of providing an active and suitable program of care for Christopher. Christopher was dirty and not thriving while with Mother. He lived in a home with hoarding and clutter. His medications were not properly administered. He also missed school frequently.

¶ 66    The trial court also considered whether Mother was of sound mind. Mother testified that a person lived in the crawl space under her home, and he would enter the home through trap doors. Mother also claimed to have had encounters with the FBI regarding photographs taken of dead bodies that she had found under her home. The GAL report indicated that Christopher's physician considered Mother to be "delusional." The court made oral findings that Mother had provided delusional testimony.

¶ 67    The court additionally considered evidence of Christopher's well-being after his removal from Mother's care in making its determination of whom to appoint as guardian. The court found that the CILA provided Christopher with an active and suitable program for a disabled adult to develop independent living skills. Testimony was presented that Christopher had a Personal Centered Plan with goals for Christopher to shower, brush his teeth, do laundry, and eat on his own. Christopher made significant process on the goals outlined in his plan. The court found that he had thrived since his removal from Mother's care. Christopher's mental health and physical needs were being cared for properly in residential placement. The trial court's order found that Shawnee Alliance met its burden of proof required for the appointment of guardian. The OSG was "best suited to be able to provide for the disabled adult's best interest and well-being."

¶ 68    Mother, however, does not argue that the procedures followed in this case were compromised because the trial court did not use exact statutory language of section 31 in the final written order. Shawnee Alliance's petition and Mother's testimony asserted that Mother and Sister were Christopher's nearest known adult relatives. Sister was present for the hearing and testified. Sister, however, had not filed a petition for guardianship for the trial court to consider. No evidence was presented that Sister or anyone else was a "willing or suitable caregiver."

¶ 69    Accordingly, we find that Mother has not overcome the presumption that the language in section 31 in question is directory. Because the statutory requirement is directory, no further proceedings are required even though the court order did not include exact language that "no other suitable and willing person could be found to accept the guardianship appointment." The trial court had appointed the OSG when no other person was available and willing to accept the guardianship appointment.

¶ 70    Finally, Mother claims that the court did not follow the requirements of section 11a-4 of the Probate Act (755 ILCS 5/11a-4 (West 2020)) by conducting a temporary guardianship hearing without providing notice to Mother after an *ex parte* letter was sent to the judge, and by not including specific statutory language in the court order appointing a temporary guardian. During oral argument, Mother abandoned these claims; therefore, they will not be considered.

¶ 71                                    III. CONCLUSION

¶ 72    For the foregoing reasons, we affirm the judgment of the circuit court of Saline County.


¶ 73    Affirmed.