**2025 IL 129755**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 129755)

*In re* V.S., a Minor (The People of the State of Illinois, Appellee, v. D.H.E., Appellant).

*Opinion filed January 24, 2025.*

JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Overstreet, Holder White, Cunningham, Rochford, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1    The respondent, D.H.E., is the biological father of V.S., the minor named in these proceedings. Following an adjudication hearing, the Cook County circuit court determined that V.S. was neglected because of an injurious environment, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)). The circuit court also found that V.S. was dependent

as a result of his mother's disability under section 2-4(1)(b) of the Act. *Id.* § 2-4(1)(b). At the conclusion of a disposition hearing, the circuit court adjudged V.S. a ward of the court and granted guardianship to the Department of Children and Family Services (DCFS), reasoning that it was in V.S.'s best interest and welfare, as both parents were unable to care for him at the time. D.H.E. appealed, arguing that (1) the neglect finding deprived him of his due process rights because he was denied the opportunity to defend against the petition, (2) the neglect finding was against the manifest weight of the evidence, and (3) the disposition order should be reversed, as the circuit court failed to provide a factual basis for its disposition. The appellate court affirmed the adjudication order of the circuit court, finding that D.H.E.'s challenges related to the adjudication of neglect were moot because he failed to also challenge the dependency finding. 2023 IL App (1st) 220817, ¶ 67. The appellate court also affirmed the disposition order, which granted guardianship and custody to DCFS based on the dispositional finding that D.H.E. was unable to take care of V.S. *Id.*

¶ 2        We allowed D.H.E.'s petition for leave to appeal pursuant to Illinois Supreme Court Rule 315 (eff. Oct. 1, 2021). We also allowed Legal Aid Chicago to file an *amicus curiae* brief in support of D.H.E.'s position, pursuant to Illinois Supreme Court Rule 345 (eff. Sept. 20, 2010). For the following reasons, we now affirm the judgment of the appellate court.

¶ 3                                I. BACKGROUND

¶ 4                          A. Circuit Court Proceedings

¶ 5        On November 29, 2021, the State filed a petition for adjudication of wardship on behalf of V.S., a minor born on November 22, 2021, and named Shavaughn S. (his mother) and D.H.E. (his father) as respondents. The petition alleged that V.S. was neglected as a result of an injurious environment and abused as a result of substantial risk of physical injury, pursuant to section 2-3(1)(b), (2)(ii) of the Act. 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2020). The petition specifically alleged the following:

            "Mother has two prior indicated reports for inadequate supervision and substantial risk of physical injury/environment injurious to health/welfare by

neglect. Mother has two other minors who are in DCFS temporary custody with findings having been entered. Mother is non-compliant with offered and recommended reunification services. Mother has untreated mental health issues. Mother was psychiatrically hospitalized after the birth of this minor. Paternity has not been established."

¶ 6        The State also filed a motion for temporary custody on November 29, 2021, and alleged that there was probable cause that the minor was neglected and abused pursuant to section 2-3(1)(b), (2)(ii) and that there was immediate and urgent necessity to take the child into temporary custody pursuant to section 2-10 (*id.* § 2-10) and prayed for a temporary custody order.

¶ 7        The circuit court appointed the Cook County Public Guardian as V.S.'s attorney and guardian *ad litem* (GAL) and appointed the Cook County Public Defender to represent D.H.E.

¶ 8                                 1. Temporary Custody Hearing

¶ 9        On November 29, 2021, the circuit court held, pursuant to section 2-10 of the Act (*id.*), a temporary custody hearing in which D.H.E. was present. Deneen Sydnor, the DCFS investigator, was asked if she considered placing V.S., who was currently with the maternal grandmother, with D.H.E. Sydnor testified that D.H.E.'s name was not on V.S.'s birth certificate.

¶ 10       D.H.E. testified that he is V.S.'s father and that he signed a voluntary acknowledgement of parentage (VAP) at the hospital on November 23, 2021, the day after V.S. was born. However, Shavaughn changed her mind and rescinded the VAP. Therefore, D.H.E.'s name was removed from the birth certificate but later readded once Shavaughn "calmed down." The circuit court then ordered a DNA test for D.H.E. to determine the parentage of V.S., and D.H.E. did not object. Finally, the court ordered V.S. to be placed temporarily in the custody of DCFS until D.H.E.'s parentage was established.

¶ 11                                  2. Status Hearings

¶ 12        On November 30, 2021, the circuit court conducted a status hearing in which
Sydnor testified that she initiated a criminal background check on D.H.E. and found
that he had been charged 20 times, with "four or six convictions." He served five
years in prison and completed probation in 2016. D.H.E. did not have any pending
criminal cases, and according to Sydnor, she did not believe his prior convictions
were a bar to him being a "suitable placement" for V.S.

¶ 13        At a status hearing on February 4, 2022, the State informed the circuit court that
the DNA test established that D.H.E. was V.S.'s father, and the circuit court entered
a parentage order for D.H.E.


¶ 14                               3. Adjudicatory Hearing

¶ 15        On May 4, 2022, the circuit court held an adjudicatory hearing, pursuant to
section 2-18 of the Act (*id.* § 2-18) with D.H.E. in attendance.

¶ 16        At the hearing, Sydnor testified that on November 24, 2021, she was assigned
to investigate Shavaughn, who had other children in DCFS custody and who was
having a psychiatric episode following her delivery of V.S. While in the hospital,
Sydnor spoke with Shavaughn and D.H.E., who stated that he was V.S.'s father,
that he wanted custody of V.S., and that he lived in a family building with relatives
who would assist him with childcare. Specifically, the maternal grandmother and a
sister were available to help D.H.E. care for V.S. Sydnor testified that D.H.E.'s
background check came back "negative" for child abuse concerns. However, she
did not make any finding about whether D.H.E. posed a risk to V.S. because "that
was not the investigation."

¶ 17        Michael McKay, Shavaughn's caseworker, testified that he was a supervisor at
ChildLink, the agency assigned to V.S. and at least one other child of Shavaughn,
whom D.H.E. did not father. According to McKay, at the time V.S. was born,
Shavaughn was not participating in services and had not visited her other child.
Medical records indicated that, when V.S. was born, Shavaughn was experiencing
an acute psychotic episode, was a threat to V.S., needed psychiatric hospitalization,
and had to be restrained. Shavaughn was paranoid and delusional and believed her

family was practicing black magic on her as well as poisoning her food. She also believed she saw angels regularly and that God was sending her messages through her television and phone. Medical records indicated (1) that she was "unfit for medical decisionmaking" and (2) that she should not be permitted to care for V.S. at this time.

¶ 18    On October 6, 2021, Shavaughn threatened to "beat" a nurse at Mitchell Hospital and was escorted out by security. In November 2021, she was diagnosed with "schizoaffective disorder, bipolar type" and was threatening violence. At the time of V.S.'s birth, Shavaughn may have been experiencing acute postpartum psychosis, "in the setting of a more chronic psychotic disorder."

¶ 19    D.H.E. was at the hospital the day after V.S.'s birth and told a doctor that he had been Shavaughn's partner for the last year and that she often said God chose her and would speak to her, which made him uncomfortable because she "puts the voice first." D.H.E. was worried that Shavaughn could not care for V.S. or herself, due to her housing instability, "religious beliefs," unemployment, and history with DCFS.

¶ 20    Shavaughn testified in her case and denied having "mental issues." She said she was "a chosen child" and that God sent her "to people that he feel[s] like are struggling with mental issues." She also stated that her family had problems with her "spiritual beliefs." D.H.E. did not testify.

¶ 21    During closing argument, the State asked for findings of neglect by environment injurious to a minor and abuse by substantial risk of injury. In support of its request for these findings, the State highlighted the fact that in October 2021, before V.S. was born, Shavaughn threatened a nurse at the hospital. The State also highlighted Shavaughn's failure to participate in services as well as the reunification process for at least one of her other children. The State noted that, with one of her other minor children, a visit occurred; however, visits were suspended because of that minor's "behavior after coming back from those visits." Lastly, in support of its request for both a neglect and abuse finding, the State noted that, after giving birth to V.S., Shavaughn was "acutely psychotic, manifesting a significant paranoia, pressured speech, [and] significant distrust in [her] medical team" and V.S. "had to be separated from [Shavaughn] at the hospital because the hospital was concerned about his safety." The GAL adopted the State's argument.

¶ 22　　At the conclusion of testimonial evidence, Shavaughn's counsel argued that, instead of this being an abuse and neglect case, the case should be a dependency case because Shavaughn's mental health issues were the cause of her parenting difficulties. The State agreed to a dependency finding in addition to the requested abuse and neglect findings. However, the GAL did not agree, arguing that Shavaughn's violent behavior is problematic, which may not be entirely based on her mental health.

¶ 23　　D.H.E.'s attorney argued that any neglect to V.S. was on the part of Shavaughn and D.H.E. had no involvement. But, overall, a finding of neglect should not be entered because D.H.E. is acknowledging parentage, is able to take care of V.S., and wants him in his care.

¶ 24　　The circuit court addressed D.H.E. in open court and explained that DCFS could not have placed V.S. with him because Shavaughn rescinded the voluntary acknowledgment of paternity that she and D.H.E. signed at the time of V.S.'s birth. This meant that, at the time of V.S.'s birth, it would not have been appropriate to place V.S. with D.H.E. because parentage had not been established. Moreover, the circuit court entered a neglect due to injurious environment and dependency finding. In so doing, the court reasoned that Shavaughn was "severely mentally ill," engaged in aggressive and threatening behaviors, and could not care for V.S. As to the dependency finding, the circuit court stated it was difficult to discern if Shavaughn's aggressive behavior at the hospital was caused by mental illness or "otherwise." The circuit court further stated that "I just feel that it makes a bit of a mockery of Dependency B if we don't acknowledge the fact that [Shavaughn's] mental health issues so profoundly impaired her ability to parent that it seems to me unnecessary to also make a substantial risk of injury [abuse] finding against her."

¶ 25　　D.H.E.'s counsel requested that the written order reflect that the findings were as to Shavaughn only, because D.H.E. was "noncustodial" and the case came into the system for reasons "specific as to the mother." The circuit court was willing to oblige; however, the State objected, arguing that D.H.E. "was in a relationship with [Shavaughn] at least to the extent of he's the father of [V.S.]" The State insisted that D.H.E. was "aware of her behaviors."

¶ 26　　　　The circuit court held an off-the-record discussion with the parties, and when the proceedings resumed, the court stated the following:

> "I will tell you, [counsel], I was a little concerned when I read the medical records yesterday at [D.H.E.'s] not denial of the mental health needs of [Shavaughn], but that he downplayed it very significantly.
>
> ***
>
> So certainly the Dep B finding does not go to [D.H.E.] There's no question about that. That is to [Shavaughn] only, but the neglect, I did have concerns for both, and so that will stand."

¶ 27　　　　On May 4, 2022, the same day of the adjudication hearing, the circuit court entered a written adjudication order reasoning that the neglect finding was entered because Shavaughn "had to be separated from the minor by hospital staff after the minor's birth due to concern about mother's mental health and behavior, father downplayed mother's mental health concerns and the abuse or neglect of the minor *** is the result of abuse or neglect inflicted by a: parent." The court also made a dependency finding under section 2-4 of the Act (705 ILCS 405/2-4 (West 2020)) because the minor was under 18 and was without proper care because of the physical or mental disability of the parent or guardian. The written order did not specify which parent.

¶ 28　　　　　　　　　　　　　　4. Dispositional Hearing

¶ 29　　　　On May 18, 2022, the circuit court held, pursuant to section 2-22 of the Act (*id.* § 2-22), a dispositional hearing, with D.H.E. present. During the hearing, the circuit court admitted the March 2022 DCFS integrated clinical assessment into evidence. The assessment noted that V.S. had been diagnosed with a ventricular septal defect in his heart on January 18, 2022, and would be reassessed for heart surgery at four months old.

¶ 30      On January 6, 2022, D.H.E. was interviewed by phone for the assessment. According to the assessment, "[i]n SACWIS,[1] there were numerous 2020 intakes which contained concerns that [D.H.E.] was in sexual relationship with a minor and one intake reporting that he admitted to doing so." An SACWIS intake note from August 2020 also reported D.H.E. was having the minor girl "recruit other girls." On December 9, 2019, D.H.E. and the minor denied being in a relationship. D.H.E. reported that he did know the minor, but she was simply a friend whom he would see almost daily, would teach how to drive, rapped with, and would be a good influence on in general. It was D.H.E.'s assertion that his former "paramour" made false accusations against him because she was jealous of him spending time with the minor. Additionally, the assessment noted that D.H.E. had three children with this former "paramour," who was violent toward him and once hit him with a car.

¶ 31      According to a note from July 22, 2020, D.H.E.'s three other children with the former "paramour" lived with their grandmother in the same building as him, but he did not care for them, nor did he see them often. D.H.E. explained during his interview on January 6, 2022, that he coparented well with his former "paramour" and saw his children three to four times a week.

¶ 32      According to an October 2022 criminal background check recounted in the assessment, D.H.E. had an extensive criminal history—he was arrested and charged 44 times with 5 convictions for dangerous drugs, larceny, robbery, and 2 convictions for weapons offenses. He was charged 7 times for assault, 6 times for dangerous drugs, 5 times for larceny, 2 times for invasion of privacy, and 19 times for traffic offenses. The assessment did not list the dates of D.H.E.'s convictions or arrests. When D.H.E. was questioned about his criminal background, he said that he had been convicted of a weapons offense after a gun was found in a car he was in and that he successfully completed boot camp and probation. The assessment noted that "[D.H.E.] may have access to guns and gang involvement."

---

[1]"SACWIS" is the Statewide Automated Child Welfare Information System operated by DCFS. See 89 Ill. Adm. Code 50.105 (2018). However, the record does not reflect that the SACWIS intake notes reported in the assessment resulted in a DCFS indicated report, which is "any report of child abuse or neglect made to [DCFS] for which it is determined, after an investigation, that credible evidence of the alleged abuse or neglect exists." *Id.* § 300.20; see 325 ILCS 5/3 (West 2020).

¶ 33    D.H.E. and Shavaughn met in December 2020 and lived together during Shavaughn's pregnancy. Initially, D.H.E. thought this planned pregnancy would benefit Shavaughn by giving her "more of a focus" so that she would be in a "better state of mind"; however, he realized that Shavaughn could not care for V.S. and would become aggressive toward D.H.E. D.H.E. did not live with Shavaughn when she gave birth to V.S. in November 2021 and expressed a desire to have custody of V.S. and "be a good father for him" once his paternity was established. He also visited V.S., and he lived in a building with relatives who he believed would help him with V.S.

¶ 34    The clinical evaluator made note of D.H.E.'s criminal record, his history of choosing unsafe partners, his questionable judgment with respect to having a baby with a woman with documented mental illness, and his belief that having a baby with her could help her, as well as the reports of his sexual relationship with a minor. The evaluator noted that all the aforementioned factors, if true, "would pose a risk to any child in his care without appropriate and possible intensive interventions."

¶ 35    The evaluator recommended that D.H.E. undergo individual therapy and the Nurturing Parenting Program (NPP), a "competency based" parenting coaching service for parents whose children have experienced "trauma and adversity." The evaluator also recommended domestic violence services because D.H.E. was a domestic violence victim and also recommended a drug evaluation because of D.H.E.'s extensive history of drug use.

¶ 36    Letitia Sanders, the assigned case manager from the ChildLink agency, testified that V.S. was placed with his maternal grandmother and that such a placement was safe and appropriate. With respect to Shavaughn, Sanders stated that she was not in services nor was she visiting V.S., and she did not live with D.H.E.

¶ 37    According to Sanders, D.H.E. needed individual therapy, parenting, and domestic violence services, as well as drug testing. She submitted those referrals on D.H.E.'s behalf, but she was unsure about whether the service providers had contacted D.H.E. Sanders stated that she reviewed the DCFS integrated clinical assessment and would refer D.H.E. for a domestic violence assessment after he began or completed his other services, specifically the therapy and planning program to avoid D.H.E. feeling overwhelmed with too many services, as he still

had to go to work and school. She did not believe that D.H.E. needed additional services, but she was not sure whether service providers had contacted him about the services he did need to complete. However, she testified that she would follow up with the referred service providers to ensure they contact D.H.E.

¶ 38     Sanders reported that D.H.E.'s May 5, 2022, drug test yielded negative results and his supervised visits with V.S. had no reported problems. She admitted that she had not visited D.H.E.'s home yet, but she testified that D.H.E. informed her that he had a crib and other items in his home for V.S. She initially testified that V.S. should not be made a ward of the court, finding D.H.E. to be fit, "very loving," and willing and able to take care of V.S., but that she would prefer he have the "support of the foster mom just during the recovery period." However, the assistant public guardian informed Sanders that, if D.H.E. still needed services, V.S. would be made a ward of the court and the parents would continue to receive services and support as they worked toward reunification services. Sanders then testified that she believed V.S. should be made a ward of the court.

¶ 39     D.H.E. testified that he wanted custody of V.S. and would ensure that anyone who was not supposed to be around him would not be. Although D.H.E. expressed that he did not feel that he needed to complete the referred services, he was still willing to comply. Additionally, he stated that he felt his caseworker was prolonging the process and he wanted to have his services completed already.

¶ 40     After the hearing, the circuit court found that it was in V.S.'s best interest to adjudge him a ward of the court and place him "in the guardianship of [DCFS]." The circuit court stated that the parents had the right to appeal the decision and addressed D.H.E. directly with the following:

> "[D.H.E.] we are going to have a very quick permanency hearing. Just bear with us. You are obviously—the evidence presented today is that you have a great bond and relationship with your child. I want you to know that I heard that and I am well aware of that. There are services that you were just referred to that have not yet begun. And I just want to make sure that those services are in place and the case continues to go in a positive direction. But I don't want you to be discouraged by your child being a ward. He is going to remain in his current placement. That's not going to change. He is going to be with [his] maternal grandmother."

The circuit court subsequently entered a written order, stating that the parents were "unable" to care for, protect, or train V.S.; that "reasonable efforts" had been made "to prevent or eliminate the need for removal of the minor from the home"; that family reunification services had been unsuccessful; and that it was in "the best interest of the minor to remove the minor from the custody of the parents, guardian, or custodian."

### 5. Permanency Hearing

¶ 41        On May 18, 2022, immediately following the dispositional hearing, the circuit court held a brief permanency hearing, pursuant to section 2-28.1 of the Act (705 ILCS 405/2-28.1 (West 2020)), and entered a goal that V.S. would return home within 12 months. It gave the agency discretion to allow D.H.E. unsupervised visits after his home was checked for safety and after he had begun the referred services. The circuit court noted that D.H.E. seemed willing and "on the path toward reunification" with his son, but the court was concerned that D.H.E. had not started the recommended services and wanted to give him the time to complete them. On June 8, 2022, D.H.E. filed a timely appeal from both the circuit court's adjudication and dispositional findings.

¶ 42                        B. Appellate Court Proceedings

¶ 43        On appeal, D.H.E. argued that (1) the neglect finding deprived him of his due process rights because he was denied the opportunity to defend against the petition, (2) the neglect finding was against the manifest weight of the evidence, and (3) the disposition order should be reversed, as the circuit court failed to provide a factual basis for its disposition. The appellate court affirmed the adjudication order of the circuit court, finding that D.H.E.'s challenges related to the adjudication of neglect were moot because he failed to also challenge the dependency finding. 2023 IL App (1st) 220817, ¶ 67. In so doing, the appellate court noted a split in the First District on whether an appeal from one of several findings of abuse, neglect, or dependency renders a parent's appeal moot. *Id.* ¶¶ 52-55; see *In re S.G.*, 2022 IL App (1st) 210899, ¶ 24 (challenge to abuse finding not "moot" where parent did not challenge neglect finding); *In re G.U.*, 2022 IL App (1st) 220759 (failure to challenge neglect

- 11 -

finding rendered abuse appeal moot); *In re J.R.*, 2022 IL App (1st) 221109 (same). After finding D.H.E.'s challenge of the neglect finding moot, the appellate court addressed his arguments challenging the sufficiency of the evidence with respect to the finding of neglect and determined that the evidence was sufficient. 2023 IL App (1st) 220817, ¶ 60. However, the court declined to address the due process argument. Lastly, the appellate court also affirmed the disposition order, which granted guardianship and custody to DCFS based on the dispositional finding that D.H.E. was unable to take care of V.S. *Id.* ¶ 67.

¶ 44       D.H.E. filed a timely petition for leave to appeal, which we allowed pursuant to Illinois Supreme Court Rule 315 (eff. Oct. 1, 2021). We also allowed Legal Aid Chicago to file an *amicus curiae* brief in support of D.H.E.'s position, pursuant to Illinois Supreme Court Rule 345 (eff. Sept. 20, 2010).

¶ 45                                   II. ANALYSIS

¶ 46       On appeal, D.H.E. argues that (1) his appeal challenging only the circuit court's neglect finding is not moot because the neglect finding has direct and collateral consequences but, even if the appeal is moot, a reviewing court has discretion to review the issue under the prudential mootness doctrine; (2) the circuit court's neglect finding was against the manifest weight of the evidence; (3) he was not provided adequate notice and opportunity to respond to the State's allegations in the wardship petition and was, therefore, denied due process; (4) the circuit court did not provide a sufficient factual basis for its dispositional order; and (5) the circuit court abused its discretion when it appointed DCFS as V.S.'s guardian.

¶ 47                                   A. Mootness

¶ 48       D.H.E. first argues that his appeal is not moot because the neglect finding has direct and collateral consequences and, even if the appeal challenging only the neglect finding is moot, this court has jurisdiction to review the issue under the prudential mootness doctrine.

¶ 49       This appeal requires us to review an adjudication and dispositional order of the circuit court under the Act. The purpose of the Act is to "secure for each minor

- 12 -

subject hereto such care and guidance \*\*\* as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community." 705 ILCS 405/1-2(1) (West 2020). The Act establishes the procedures the circuit court must follow to determine whether a minor should be removed from his parents' custody and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462-63 (2004). The process begins when the State, as in the case under review, files a petition for wardship and the minor is placed in temporary custody. *Id.* at 462. The circuit court then conducts an adjudicatory hearing, where it considers only "whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2020). If the circuit court finds that a minor is abused or neglected, it then conducts a dispositional hearing. *Id.* § 2-21(2). During the dispositional hearing, the circuit court is tasked with ascertaining "whether it is consistent with the health, safety and best interests of the minor and the public that [the minor] be made a ward of the court." *Id.*

¶ 50         " '[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances.' " *In re A.P.*, 2012 IL 113875, ¶ 17 (quoting *In re Arthur H.*, 212 Ill. 2d at 463). In adjudication proceedings, the State has the burden of proving allegations of neglect or abuse by a preponderance of the evidence. *Id.* In other words, the State must establish that the abuse and neglect allegations are more probable than not.

¶ 51         A reviewing court will not reverse a circuit court's finding of abuse or neglect unless it is against the manifest weight of the evidence. *In re Z.L.*, 2021 IL 126931, ¶ 61. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 52         In this case, the circuit court, without distinguishing between the parents, made a finding of abuse and neglect under section 2-3 of the Act (705 ILCS 405/2-3 (West 2020)) and a finding of dependency under section 2-4 of the Act (*id.* § 2-4). D.H.E. only raised a challenge to the neglect finding, leaving the dependency finding unchallenged. Section 2-21(2) of the Act provides that, if the court determines that "the minor is either abused or neglected or dependent," a dispositional hearing shall be held to determine whether it is in the best interest of the minor to be adjudged a ward of the court. *Id.* § 2-21(2). This means the circuit court could make a finding based on any one (or more) of the three determinations

and hold a dispositional hearing. Therefore, the question remains: is a challenge to one finding sufficient when the court enters more than one finding, or will that render the appeal moot?

¶ 53                                    B. Cases Suitable for Adjudication

¶ 54        There are certain cases that are appropriate or suitable for adjudication by a court. However, "[i]t is a basic tenet of justiciability that reviewing courts will not decide moot or abstract questions or render advisory opinions." *In re J.T.*, 221 Ill. 2d 338, 349 (2006). An appeal is moot when there is no actual controversy and a reviewing court's decision could have no practical effect on the parties, rendering it "impossible for the reviewing court to grant effectual relief." *Id.* at 349-50. But a court will decide a moot question in three circumstances: (1) when resolution is in the public's interest, (2) where the issue is capable of repetition yet evading review, and (3) where collateral consequences to the appellant arise from the judgment. *In re Alfred H.H.*, 233 Ill. 2d 345, 355-61 (2009). In the case under review, D.H.E. argues that, if this court determines that his appeal is moot, only the third exception—collateral consequences—applies here. Whether a court's mootness determination is correct is a legal issue subject to *de novo* review. *In re Rita P.*, 2014 IL 115798, ¶ 30.

¶ 55        We note that our appellate court is divided on the question of whether a parent's appeal is moot where a challenge is made to one finding in an abuse and neglect case but not another. Some panels of the First District have found that it regularly considers "cases in which only one of several bases [was] appealed." See *In re S.G.*, 2022 IL App (1st) 210899, ¶ 24. Other panels have found that an appeal of an abuse finding is moot where the neglect finding was not also challenged. See *In re G.U.*, 2022 IL App (1st) 220759, ¶ 20; *In re J.R.*, 2022 IL App (1st) 221109, ¶ 48. In the case under review, the appellate court chose to follow *In re G.U.* and *In re J.R.*, finding D.H.E.'s challenge to the neglect finding moot because he did not also challenge the dependency finding on appeal. 2023 IL App (1st) 220817, ¶ 56.

¶ 56        We agree with the panels in *In re J.R.* and *In re G.U.* and find that our decisions in *In re Faith B.*, 216 Ill. 2d 1, 9-12 (2005), and in *In re D.L.*, 191 Ill. 2d 1, 8 (2000) are instructive.

¶ 57 In *In re Faith B.*, 216 Ill. 2d at 9-12, after an adjudicatory hearing, the circuit court found that the minors were abused and neglected. On appeal, the mother challenged both findings. *Id.* at 12. This court reviewed the circuit court's finding of neglect based on an injurious environment and affirmed the ruling of the circuit court. *Id.* at 13-14. We then found that we did not need to review the circuit court's finding that the minors were abused or neglected based on physical abuse because the neglect finding based on injurious environment was sufficient. *Id.* at 15. In so doing, we reinforced the principle that a single finding of neglect, abuse, or dependency is enough to affirm the judgment of the circuit court. Applying this principle to the case under review, where a neglect, abuse, or dependency finding remains unchallenged, we need not review the appeal, as the remaining finding will still provide the grounds for wardship and any review would not offer effective relief. *In re J.T.*, 221 Ill. 2d at 349-50.

¶ 58 Additionally, in *In re D.L.*, 191 Ill. 2d at 8, a termination of parental rights case, we found that the appeal was moot where the mother challenged only one of the grounds upon which the appellate court determined that she could be unfit. In *In re D.L.*, the circuit court found that the State failed to establish any of the grounds for unfitness in its petition for termination of the mother's parental rights. *Id.* at 6. The appellate court reversed the decision of the circuit court and remanded the cause to the circuit court, finding that the State had established at least three grounds on which the mother was an unfit parent. *Id.* at 7. The mother appealed, and this court recognized that she had only challenged one of the grounds upon which the appellate court determined that she could be unfit. *Id.* at 7-8. Consequently, we found that her appeal was moot because of her failure to challenge the other grounds. *Id.* at 8.

¶ 59 Similarly, we find, following *In re Faith B.* and *In re D.L.*, that D.H.E.'s appeal is moot because of his failure to challenge the dependency finding that would remain in effect even if this court were to have found error with respect to the neglect finding. Additionally, we find that, where a circuit court makes more than one finding that a minor is abused, neglected, or dependent, those appellate court cases holding that a respondent may appeal only one of multiple findings are overruled.

¶ 60                               C. The Collateral Consequences Exception

¶ 61        In addition, we do not find that the collateral consequences exception applies here. "Under this exception, where collateral consequences survive the expiration or cessation of a court order that are likely to be redressed by a favorable judicial determination, appellate review is permissible." *In re Rita P.*, 2014 IL 115798, ¶ 31. In other words, a case is not moot if there remains a secondary or collateral injury despite the resolution of a party's primary claim. See *Sibron v. New York*, 392 U.S. 40, 57 (1968). " '[M]ootness [remains] if no consequences can be foreseen or if foreseeable possible consequences seem remote.' " (Emphasis omitted.) *Kansas Judicial Review v. Stout*, 562 F.3d 1240, 1248 (10th Cir. 2009) (quoting 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters § 3533.3.1, at 124 (3d ed. 2008)). This means that collateral consequences cannot be based on "vague, unsupported" statements about the future. *In re Rita P.*, 2014 IL 115798, ¶ 34. A reviewing court must consider all relevant facts and legal issues raised in the appeal before deciding whether the collateral consequences exception applies. *In re Alfred H.H.*, 233 Ill. 2d at 364. Moreover, collateral consequences must be identified that "could stem *solely* from the present adjudication." (Emphasis added.) *Id.* at 363. Application of the collateral consequences exception is determined on a case-by-case basis. *Rita P.*, 2014 IL 115798, ¶ 33; *In re Alfred H.H.*, 233 Ill. 2d at 362.

¶ 62        Based on the facts of this case, no significant collateral or direct consequences for D.H.E are triggered that are specifically tied to the neglect finding. Therefore, reversal of the neglect finding alone would not benefit him in an effective way. First, the relative blame as to who caused the neglect is not the consideration at the adjudication stage. See *In re A.P.*, 2012 IL 113875, ¶ 19; see also *In re Arthur H.*, 212 Ill. 2d at 467 (" '[P]arents are not adjudicated neglectful at the adjudicatory stage of the proceedings under the Act; rather, minors are adjudicated neglected.' " (quoting *In re Arthur H.*, 338 Ill. App. 3d 1027, 1042 (2003) (Kapala, J., dissenting))). In other words, the condition or status of the child as being neglected, abused, or dependent is the focus, not the relative fault of either parent. See *People v. R.G.*, 131 Ill. 2d 328, 364 (1989) ("Although the parents of a dependent minor may not be at 'fault,' the dependent minor is nevertheless not receiving proper care from the parents. The State can remove both dependent and addicted minors from their homes without the consent of the parents or the minor.").

¶ 63    While the findings could possibly be used against D.H.E. in a future proceeding, the Act states that the "proof of abuse, neglect *or* dependency" of one child is admissible evidence in proceedings involving another child for whom a parent or guardian is responsible. (Emphasis added.) 705 ILCS 405/2-18(3) (West 2020). However, (1) there are no other proceedings pending involving another child of D.H.E.; (2) it would be speculative to conclude that there will be such a proceeding; and (3) even if a proceeding would later arise, the evidence of the neglect finding is only admissible, and D.H.E. can challenge the veracity and probative weight of the finding at that time. See *Id.* § 2-18(2)(a)-(k) (listing proofs that "shall constitute prima facie evidence of abuse or neglect"). In short, the neglect finding is the only evidence that would be admissible in a future, currently nonexistent and unexpected, proceeding. Therefore, no collateral consequences would result. See *In re Alfred H.H.*, 233 Ill. 2d at 361, 364 (explaining that collateral consequences must be "proved or presumed").

¶ 64    Moreover, the record is silent pertaining to D.H.E. having received an indicated report by DCFS with respect to neglect; therefore, his argument about not being able to challenge an indicated report is unavailing and amounts to a "vague, unsupported" statement insufficient for collateral consequence purposes. *In re Rita P.*, 2014 IL 115798, ¶ 34. Further, even if D.H.E. had received an indicated report, he could not establish that the circuit court's finding of neglect was the sole reason for any collateral consequences, as his past convictions for drug offenses, larceny, robbery, and weapons offenses remain. Therefore, the neglect finding did not and would not be the catalyst for any significant collateral consequences distinct from those stemming from the dependency finding, which remains unchallenged, for it is the conduct underlying the finding and not the finding itself that is probative. See *Spencer v. Kemna*, 523 U.S. 1, 15 (1998) ("And as to the possibility that the parole revocation could be used directly against petitioner should he be the object of a criminal prosecution, it is at least as likely that the conduct underlying the revocation, rather than the revocation itself (which does not recite the specific conduct constituting the parole violation) would be used."). In other words, evidence that D.H.E. actively chose to have a child with someone with severe mental health issues even though her other children had been removed from her care is more probative than a simple finding of neglect.

¶ 65 Because we find that D.H.E.'s appeal is moot, we need not address the remaining issues on appeal. We note that although the appellate court found D.H.E.'s challenge to the adjudicatory finding of neglect was moot, it nonetheless took the "opportunity to address [D.H.E.'s] primary issue with the adjudication findings." 2023 IL App (1st) 220817, ¶ 57. After consideration, the appellate court found D.H.E.'s claims "without merit." *Id.* Therefore, D.H.E did receive appellate review of his claim.

¶ 66 Additionally, in his petition for leave to appeal before this court, D.H.E. asked this court to decide "whether a parent's challenge to a finding of abuse or neglect is moot whenever any other finding is not challenged." We have answered that question, and any other questions not raised in the petition for leave to appeal as required by Rule 315 are forfeited. *MD Electrical Contractors, Inc. v. Abrams*, 228 Ill. 2d 281, 296, 299-300 (2008).

¶ 67                                    III. CONCLUSION

¶ 68 We find that D.H.E.'s appeal, challenging only the circuit court's neglect finding and failing to challenge the dependency finding, is moot. Accordingly, we affirm the judgment of the appellate court which affirmed the judgment of the circuit court.

¶ 69 Judgments affirmed.