2025 IL App (1st) 240985

No. 1-24-0985

Opinion filed June 23, 2025.

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| PAULA BLAKEMORE, as Independent Executor of the Estate of Erica Ford, Deceased, | ) ) ) | Appeal from the Circuit Court Of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 2023 L 3036 |
| CATHOLIC CHARITIES OF THE ARCHDIOCESE OF CHICAGO, | ) ) ) ) | The Honorable Maureen O. Hannon, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Pucinski and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Erica Ford, now deceased, had four young children, including one with Kweku McMillian, who had a history of violence toward her and the children. In one instance, McMillian locked Ford in the trunk of her car and kidnapped three of the children, leading the Department of Children and Family Services (DCFS) to become involved. Subsequently, DCFS contracted with defendant, Catholic Charities of the Archdiocese of Chicago (Catholic Charities), to investigate the situation.

¶ 2    Several months later, Catholic Charities determined there were no more safety concerns regarding McMillian and closed Ford's case. Shortly thereafter, police responded to a couple domestic disturbance calls involving McMillian at Ford's home. The next month, McMillian drove a car over Ford, killing her, while two children were inside the vehicle. Two of Ford's other children watched from outside the car. McMillian kidnapped the children inside the car and abused one of them, before being apprehended by police.

¶ 3    Plaintiff, Paula Blakemore, as independent executor of Ford's estate and acting on behalf of Ford's minor children, filed the instant wrongful death suit against Catholic Charities. Plaintiff alleged, in the main, that Catholic Charities' negligence in failing to discover, assist, and/or communicate the domestic violence situation in Ford's home proximately caused her death. Catholic Charities moved to dismiss, asserting it was an agent of DCFS, a State of Illinois agency, and thus, had sovereign immunity against plaintiff's suit. The court below agreed, finding jurisdiction belonged solely to the Court of Claims, and granted Catholic Charities' dismissal motion. Plaintiff later moved, unsuccessfully, to reconsider the court's ruling, as well as to conduct further discovery on the agency issue and for leave to amend her complaint.

¶ 4    On appeal, plaintiff contends the circuit court erroneously dismissed the case for lack of subject matter jurisdiction because, *inter alia*, Catholic Charities did not prove, as a matter of law, that it was an agent of DCFS. Plaintiff alternatively contends the court erred in barring further discovery concerning the agency issue and in denying plaintiff leave to amend her complaint to clarify Catholic Charities' role with respect to DCFS.

¶ 5    For the following reasons, we reverse the lower court's judgment and remand for further proceedings consistent with this decision.

¶ 6                                    BACKGROUND

¶ 7     On March 28, 2023, plaintiff filed the instant one-count complaint against Catholic Charities, setting forth a wrongful death claim based on Catholic Charities' alleged failure to take reasonable steps to discover and prevent continued domestic violence by McMillian against Ford and her children. The complaint alleged the following pertinent information.

¶ 8     In late June 2017, DCFS opened an investigation after police located one of Ford's children abandoned at a gas station, a fact later confirmed through a frantic phone call with Ford. McMillian, the father of one of her children, allegedly lured the abandoned seven-year-old child out of the car at the gas station and locked Ford inside the trunk of her car. He then drove away, kidnapping Ford and the other three children while leaving the seven-year-old behind. The next day, DCFS investigators visited Ford, who stated she was afraid of McMillian and did not want him in the home. At that time, investigators observed injuries on the face of Ford's then-three-year-old daughter. Consequently, DCFS indicated it was imperative to design a plan to help keep Ford and her children safe from McMillian.

¶ 9     A few weeks later, DCFS assigned its investigation to Catholic Charities, a not-for-profit corporation and charitable institution that provides social services to families, like Ford's, suffering from domestic violence and/or child abuse, among other things. One of Catholic Charities' goals is to keep families intact and prevent out-of-home placement of children. During Catholic Charities' investigation, McMillian posted photographs on Facebook depicting Ford and her children on about seven different occasions. Moreover, McMillian was present in Ford's home when Catholic Charities visited on eight different dates from July 2017 to September 2017. Also during that timeframe, police were dispatched to Ford's home five times for domestic disturbance calls involving McMillian, including instances where he lit Ford's possessions on fire in the backyard and stole Ford's car.

¶ 10     In another instance, McMillian pinned Ford's aunt to a wall, pushed Ford's mother, and threw Ford's then-11-year-old son down a flight of stairs, resulting in McMillian's arrest. He was charged with three counts of domestic battery and sentenced to 50 days in jail. He later pled guilty to the domestic battery charges as to Ford's aunt and mother. Despite the alleged violence involving McMillian in Ford's home, that same month, Catholic Charities reduced its "then-set visitation schedule."

¶ 11     Meanwhile, Ford's aunt and mother received orders of protection against McMillian that read: "Petitioner is fearful of further abuse. There is a history of abuse." Around the same time, McMillian apparently also had attempted murder charges pending against him. Nevertheless, on a "Child Endangerment Risk Assessment Protocol" completed in October 2017, Catholic Charities marked "no" for the following statements: "(1) A paramour whose behavior is, or has been, violent, and out of control; and (2) The presence of domestic violence that affects a caregiver's ability to provide care for a child or protect a child from moderate or severe harm." A couple weeks later, in early November 2017, Catholic Charities reported that McMillian was still communicating/in contact with Ford and her children. Ford missed five appointments with Catholic Charities between November 2017 and December 2017.

¶ 12     Notwithstanding the above, on January 23, 2018, Catholic Charities recommended closing Ford's case, finding no evidence that McMillian was still involved with the family and that Ford did not know his whereabouts. McMillian was released from jail three days later. Although Catholic Charities visited the family about a week after his release, at which time one of Ford's children indicated McMillian was asleep upstairs, it did not ask Ford whether McMillian was still involved with the family. Catholic Charities closed Ford's case the next day, finding no further safety concerns.

¶ 13    Ten days later, police responded to a domestic disturbance call involving McMillian at Ford's home. Police observed strangulation marks on Ford's neck. A week or so later, police responded to another domestic disturbance call involving McMillian at Ford's home. McMillian subsequently posted a photograph with Ford on Facebook.

¶ 14    On March 9, 2018, less than two months after Catholic Charities closed Ford's case, McMillian ran Ford over with a car, killing her, while two of her children were restrained inside the vehicle and the other two watched from the lawn. McMillian then kidnapped the two younger children inside the car and abused one of them before he was arrested by police.

¶ 15    Plaintiff, relying on the above, primarily alleged that Catholic Charities had a duty under accepted social work practices and standards to protect Ford and her children from harm at the hands of McMillian. She further alleged that, in light of McMillian's violent history toward Ford and her children, Catholic Charities negligently failed to discover the continuing domestic violence in Ford's home, and its negligence proximately caused Ford's death.

¶ 16    Catholic Charities initially filed an answer to plaintiff's complaint but later withdrew it and instead moved to dismiss the complaint pursuant to section 2-619(a)(1), (9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(1), (9) (West 2022)). Specifically, Catholic Charities asserted the circuit court lacked subject matter jurisdiction over the suit because Catholic Charities was an agent of DCFS, a state agency, and thus sovereign immunity applied. According to Catholic Charities, because sovereign immunity applied, it could only be sued in the Court of Claims. Attached to the dismissal motion was a copy of the contract between Catholic Charities (Vendor) and DCFS (Department).

¶ 17     Under the contract, DCFS reserved the right to set standards for Catholic Charities'
performance and monitor its work, among other things. The contract also contained the
following relevant provisions:

> "ARTICLE XXV
>
> LAWSUITS AND INDEMNIFICATION
>
> 25.1. Independent Contractor. Vendor is an independent contractor under this
> Agreement and neither Vendor nor any employee or agent of Vendor is an employee of
> Department and do not acquire any employment rights with Department or the State of
> Illinois by virtue of this Agreement. Vendor will provide the agreed services and achieve
> the specified results free from the direction or control of Department as to the means and
> methods of performance. Vendor will be required to provide its own equipment and
> supplies necessary to conduct its business; provided, however, that in the event, for its
> convenience or otherwise, Department makes any such equipment or supplies available to
> Vendor, Vendor's use of such equipment or supplies provided by Department pursuant to
> this Agreement shall be strictly limited to official Department or State of Illinois business
> and not for any other purpose, including any personal benefit or gain.
>
> 25.2. Indemnification. To the extent permitted by law, Vendor agrees to hold
> harmless Department against any and all liability, loss, damage, cost or expenses,
> including attorneys' fees, arising from the intentional torts, negligence or breach of
> contract of Vendor, with the exception of acts performed in conformance with an explicit,
> written directive of Department. Indemnification by Department will be governed by the
> State Employee Indemnification Act (5 ILCS 350/1 *et seq.*) as interpreted by the Illinois

Attorney General. Department makes no representation that Vendor, an independent

contractor, will qualify or be eligible for indemnification under said Act."

¶ 18    Catholic Charities argued that, even though the contract clearly identified it as an

independent contractor, it was nevertheless an agent of DCFS because, among other reasons,

DCFS controlled how it administered its child welfare services. As will be discussed below,

Catholic Charities, in arguing that sovereign immunity applied, discussed the various *Healy*

factors, which are used to determine whether a suit against a state employee is really a suit

against the state, implicating sovereign immunity. See *Healy v. Vaupel*, 133 Ill. 2d 295, 309

(1990). In response, plaintiff argued that her suit would not control the state's actions and that

her complaint set forth allegations that Catholic Charities violated regulations and statutes and

breached duties independent of its relationship with DCFS.

¶ 19    Following oral argument from the parties, the circuit court granted Catholic Charities'

motion and dismissed plaintiff's suit, finding it lacked subject matter jurisdiction because

Catholic Charities was an agent of DCFS, and thus, sovereign immunity barred plaintiff's claim

in the circuit court. The Court of Claims, therefore, was the only appropriate venue for the suit.

¶ 20    In reaching its conclusion that Catholic Charities was entitled to judgment as a matter of

law, we note the court relied on *Todd v. Catholic Charities of the Archdiocese of Chicago*, No. 1-

22-1695 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)),

notwithstanding that it was an unpublished summary order filed under Illinois Supreme Court

Rule 23(c)(2) (eff. Feb. 1, 2023) and thus not precedential (see Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1,

2023)), an issue we will expand on further below.[1]

---

[1]We further note that the *Todd* case was first presented to the court below in Catholic Charities' reply to plaintiff's response to its section 2-619(a)(1), (9) motion to dismiss.

¶ 21    In any event, plaintiff subsequently moved for reconsideration of the court's ruling, arguing that dismissal was improper because the contract's independent contractor provisions established that Catholic Charities was not an agent of DCFS, and that the court's reliance on *Todd*, an unpublished decision, was inappropriate. The court denied plaintiff's motion on April 3, 2024.

¶ 22    We note that plaintiff also asked the circuit court to accept jurisdiction in the event that the Court of Claims rejected it, but the court declined. Likewise, the court denied plaintiff's request to conduct further discovery on the agency issue and for leave to file an amended complaint.

¶ 23    This appeal followed.

¶ 24                                        ANALYSIS

¶ 25    As stated, plaintiff contends the lower court erred in granting Catholic Charities' motion to dismiss under section 2-619(a)(1) of the Code because the court incorrectly determined that sovereign immunity applied and deprived it of subject matter jurisdiction.

¶ 26    "The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proved issues of fact at the outset of litigation." *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). A section 2-619 motion to dismiss admits the legal sufficiency of a claim but asserts an affirmative defense or other matter that avoids or defeats it. *Id.* Moreover, section 2-619(a)(1) provides for the involuntary dismissal of an action based on lack of subject matter jurisdiction. 735 ILCS 5/2-619(a)(1) (West 2022).

¶ 27    In ruling on such a motion, courts should construe the pleadings and supporting documents in favor of the nonmoving party. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. Courts must accept as true all well-pleaded facts in the plaintiff's complaint and all inferences that may

reasonably be drawn in her favor. *Id.* Likewise, since a section 2-619 dismissal resembles the grant of a motion for summary judgment, we must determine whether "a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." (Internal quotation marks omitted.) *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 383 (1997). We review a dismissal under section 2-619 *de novo*. *Id.*

¶ 28    In this case, the circuit court determined that DCFS, a state agency, and Catholic Charities had a principal-agent relationship, and therefore, plaintiff's suit was barred by sovereign immunity, a common law doctrine that protects the government from being sued without its consent. See *Coleman v. East Joliet Fire Protection District*, 2016 IL 117952, ¶ 25; *Lavery v. Department of Financial & Professional Regulation*, 2023 IL App (1st) 220990, ¶ 25.[2] In Illinois, the application of sovereign immunity is governed by the State Lawsuit Immunity Act (745 ILCS 5/0.01 *et seq.* (West 2022)). Section 1 of that act states, "[e]xcept as provided in the Illinois Public Labor Relations Act, the Court of Claims Act, the State Officials and Employees Ethics Act, and Section 1.5 of this Act, the State of Illinois shall not be made a defendant or party in any court." *Id.* § 1. Thus, the circuit court found that the Court of Claims had sole jurisdiction over the case because DCFS and Catholic Charities had a principal-agent relationship as a matter of law.

¶ 29    "An agent is one who, acting under authority from another, transacts business for [it], and a true agency requires that the agent's function be the carrying out of the principal's affairs." *Lang v. Consumers Insurance Service, Inc.*, 222 Ill. App. 3d 226, 232 (1991). The existence and scope of an agency relationship are generally questions of fact; however, courts may decide the

---

[2]We note that a petition for leave was filed in *Lavery*, which is currently pending before our supreme court, and an oral argument was heard in that matter on May 21, 2025.

issue only if the relationship is so clear as to be undisputed. *C.A.M. Affiliates, Inc. v. First American Title Insurance Co.*, 306 Ill. App. 3d 1015, 1021 (1999). The burden of proving an agency relationship exists and the scope of authority is on the party seeking to charge the alleged principal, here Catholic Charities. *McNerney v. Allamuradov*, 2017 IL App (1st) 153515, ¶ 64.

¶ 30    An independent contractor, on the other hand, undertakes to produce a given result but, in the actual execution of the work, is not under the orders or control of the entity for whom it does the work. *Id.* ¶ 68. Moreover, although a principal is vicariously liable for the conduct of its agent, it is generally not liable for the actions of an independent contractor. See *id.* ("As a general rule, no vicarious liability exists for the actions of independent contractors."). The contract in this case between DCFS and Catholic Charities unequivocally provided that Catholic Charities was an independent contractor. We recognize, however, that the declaration of the parties is not always controlling, especially where the conduct of the parties demonstrates the existence of an agency relationship. *Id.* ¶ 69.

¶ 31    In determining what the relationship is between the parties, courts consider factors such as the right to control the manner in which the work is done; the method of payment; the right to discharge; the skills required in the work to be done; and who provides the tools, materials, and equipment. *Id.* ¶ 70. Moreover, as mentioned above, in our supreme court's 1990 decision, *Healy*, 133 Ill. 2d at 309, the court adopted a three-part analysis to determine whether a suit against a state employee is actually a suit against the state, implicating sovereign immunity. There, the court determined that statutory immunity would apply when (1) there are no allegations that an agent or employee of the State acted beyond the scope of its authority through wrongful acts, (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment, and (3) where the complained-of actions involve

matters ordinarily within that employee's normal and official functions of the State. *Id.* "In those circumstances, the action is one against the State and must, therefore, be brought in the Court of Claims." *Id.*

¶ 32    Initially, we note that the parties have engaged in little discovery with respect to the agency issue since this case was dismissed at the pleadings stage.[3] They have devoted much effort on appeal to discussing whether Catholic Charities is an agent of DCFS as a matter of law. After accepting as true all well-pleaded facts in plaintiff's complaint and drawing all inferences reasonably in her favor, as we must, we find that plaintiff has at minimum raised a question of fact regarding the existence and scope of an agency relationship between Catholic Charities and DCFS.

¶ 33    As set forth, the contract between Catholic Charities and DCFS expressly stated that Catholic Charities was an "independent contractor" and not "an employee of [DCFS]." The contract further provided that Catholic Charities "[did] not acquire any employment rights with [DCFS] or the State of Illinois by virtue of this Agreement" and would "provide the agreed services and achieve the specified results *free from the direction and control of [DCFS]* as to the means and methods of performance." (Emphasis added.) Likewise, Catholic Charities had to "provide its own equipment and supplies necessary to conduct its business" unless such supplies were made available by DCFS. Importantly, the contract also contained an indemnification provision that provided: "[Catholic Charities] agrees to hold harmless [DCFS] against any and

---

[3]We further note that not a single deposition had been taken when this case was dismissed. Additionally, at the hearing below on plaintiff's motion for leave to amend her complaint, the court asked plaintiff's counsel why he had not named individuals from Catholic Charities as additional defendants. Counsel indicated further discovery, like depositions, was needed to identify such individuals. Counsel, however, still maintained his position that plaintiff did not need to name any additional individuals since Catholic Charities was not an agent of DCFS.

all liability, loss, damage, cost or expenses, including attorneys' fees, arising from the intentional torts, negligence or breach of contract of [Catholic Charities], with the exception of acts performed in conformance with an explicit, written directive of [DCFS]."

¶ 34    While Catholic Charities has correctly observed that a determination of sovereign immunity is not necessarily based on "whether an individual defendant is entitled to State indemnification" (see *Healy*, 133 Ill. 2d at 315-16), it is still true that a contract's language is the best indicator of whether an employer has retained control over an independent contractor's work. See, *e.g.*, *Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App (1st) 130771, ¶ 74 (noting that "[t]he best indicator of whether an employer has retained control over the independent contractor's work is the parties' contract, if one exists"); *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 41 (same). Furthermore, as stated, we acknowledge that the formal identification of a party in a contract as an independent contractor is not always controlling. However, the strong contract language here that Catholic Charities was not an employee and "free from the direction and control of [DCFS]" certainly suggests that the parties did not intend to establish a principal-agent relationship.[4] At the very least, it raises a question of fact as to the existence and scope of such a relationship.

¶ 35    We now turn to the *Healy* factors to determine whether sovereign immunity applies. We find that plaintiff, at minimum, set forth allegations in her complaint that created a genuine issue of material fact as to whether her action against Catholic Charities was in reality an action

---

[4]The parties make compelling arguments regarding the level of control, if any, DCFS had over Catholic Charities' work; however, without further discovery, we find the contract's language stating that Catholic Charities was "free from the direction and control" of DCFS demonstrates there is a question of fact as to that issue. We recognize the contract also provided that Catholic Charities was required to accept all cases and paid on a per cases basis and that DCFS was allowed to monitor Catholic Charities' performance and work. Again, this shows there is a question of fact as to how much control, if any, DCFS had over Catholic Charities.

against the State (DCFS). As to the first factor, plaintiff did set forth allegations that an agent or employee of the State acted beyond the scope of its authority through wrongful acts. Specifically, plaintiff alleged that Catholic Charities found "there were no safety concerns" in Ford's home and discharged her case. Yet, according to plaintiff, DCFS "found that Erica Ford was scared of Kweku McMillian and did not want him in the house," "found evidence of domestic violence," "noticed scratches on [Ford's] three-year-old [daughter's] face," and "noted the necessity to install a plan to keep Kweku McMillian away from the children." These allegations suggest that Catholic Charities exceeded the scope of its authority, as its discharge of Ford's case contravened DCFS' own findings that there was a continuing domestic violence issue. Because plaintiff did set forth allegations that Catholic Charities acted beyond the scope of its authority, the first factor was not satisfied.

¶ 36    We acknowledge that DCFS made its findings before Catholic Charities ultimately determined there were no safety concerns. Yet, plaintiff's complaint still set forth other allegations indicating that Catholic Charities acted beyond the scope of its authority. For example, plaintiff alleged that Catholic Charities reduced its visitation schedule, notwithstanding that McMillian had recently pinned Ford's aunt to a wall, pushed Ford's mother, and had thrown Ford's then-11-year-old son down a flight of stairs. Plaintiff further alleged that Catholic Charities marked "no" for statements indicating the presence of a violent paramour and domestic violence that affected Ford's ability to care for her children and/or protect them from harm, even though McMillian had pending attempted murder charges and orders of protection against him. Moreover, Catholic Charities visited the family shortly after it recommended closing Ford's case and learned that McMillian was asleep upstairs, but nevertheless closed Ford's case the following day.

¶ 37    We turn to the second factor for determining if sovereign immunity applies, *i.e.*, whether the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment. *Healy*, 133 Ill. 2d at 309. In that regard, plaintiff alleged that Catholic Charities had duties under general "accepted social work practices and standards" that it breached by, among other things, failing to discover the continued presence of domestic violence in Ford's home, despite plenty of evidence to the contrary. Although plaintiff also included allegations that Catholic Charities had duties stemming from its contract with DCFS, this allegation, construed in the light most favorable to plaintiff, sets forth that Catholic Charities had a duty based on its general status as an organization providing social services, independent of its employment with DCFS. Stated differently, plaintiff set forth allegations that could support a finding that the first two *Healy* factors were not satisfied, as plaintiff alleged that Catholic Charities' wrongful acts put them outside the scope of its employment-related duties.

¶ 38    The third *Healy* factor would probably be satisfied as the complained-of actions likely involved matters ordinarily within Catholic Charities' official functions of the State. Because the first two factors were not satisfied, however, we cannot say, as a matter of law, that plaintiff's action against Catholic Charities was in reality an action against the State, implicating sovereign immunity. Simply put, the dismissal of plaintiff's suit without conducting further discovery was premature because the agency issue was not "so clear" as to be undisputed. See *McNamee v. Sandore*, 373 Ill. App. 3d 636, 651 (2007) ("While agency is a legal concept, the existence and scope of an agency relationship is a fact-intensive inquiry reserved for the finder of fact unless the parties' relationship is so clear as to be undisputed."). As shown above, both the contract between Catholic Charities and DCFS and the relevant *Healy* factors demonstrate there was a

material issue of fact concerning the existence and scope of an agency relationship in this case, making dismissal under section 2-619 improper.

¶ 39    Finally, it bears reiterating that the lower court, in determining that plaintiff's suit was barred by sovereign immunity, relied on an unpublished and nonprecedential summary order from this court (*Todd*, No. 1-22-1695). While such a decision may be used for persuasive purposes, this begs the question as to why it was relied on significantly to determine that Catholic Charities was entitled to judgment as a matter of law.[5] As stated, a dismissal under section 2-619 aims to dispose of issues of law and easily proved issues of fact at the outset of litigation and, thus, would presumably be based on well-settled law, which is not quite what happened here. Regardless, this too suggests that the dismissal of plaintiff's suit was premature because questions of fact existed concerning the existence and scope of an agency relationship between Catholic Charities and DCFS in this case.

¶ 40    Based on the foregoing, we need not address the parties' alternative arguments regarding whether the lower court abused its discretion in denying plaintiff's request to conduct further discovery as to the agency issue and for leave to file an amended complaint. See, *e.g.*, *Wynne v. Loyola University of Chicago*, 318 Ill. App. 3d 443, 455 (2000) (reviewing pretrial discovery rulings for an abuse of discretion); *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273-74 (1992) (reviewing denial of motions for leave to amend for an abuse of discretion).

---

[5]We note that the circuit court also relied on a Seventh Circuit case in its order granting Catholic Charities' section 2-619 dismissal motion. Likewise, plaintiff relied on an unpublished federal decision (*Griffin v. Poynter*, No. 20-cv-1427-JES-JEH, 2022 WL 16836605 (C.D. Ill. Nov. 9, 2022)), in arguing to the court below (and here) that sovereign immunity did not apply in this case. Because the issues before us on appeal are not novel issues where we need to look to other nonbinding state law and/or guidance, we will not address those cases here.

We observe that the circuit court did not review in full the factors required for an amended complaint because it believed it did not have the authority following the 2-619 dismissal.[6]

¶ 41 Given our disposition, however, that there was a question of fact as to the existence and scope of an agency relationship between Catholic Charities and DCFS, the parties naturally must be allowed on remand to proceed with discovery and be given the opportunity to file any amended pleadings. See *supra* ¶ 39; *Loyola Academy*, 146 Ill. 2d at 273 (noting the four factors used to determine whether the lower court abused its discretion in denying leave to amend a complaint); *In re V.S.*, 2025 IL 129755, ¶ 54 (noting that reviewing courts will not decide abstract questions or render advisory opinions).

¶ 42                                  CONCLUSION

¶ 43 For the reasons set forth above, we reverse the circuit court's judgment granting Catholic Charities' section 2-619(a)(1) motion to dismiss and remand for further proceedings consistent with this decision.

¶ 44 Reversed and remanded.

---

[6]We note that plaintiff requested during the motion to reconsider pleadings to amend her complaint. For example, Catholic Charities opposed the motion to reconsider, and in her reply, plaintiff attached a copy of the proposed amendment. Plaintiff, however, also filed a separate motion to file the amended complaint. The court and parties then focused on whether the court had jurisdiction to consider the separate motion to amend the complaint, given that it was filed more than 30 days after the 2-619 ruling. See 735 ILCS 5/2-1203(a) (West 2022) (requiring a postjudgment motion to be filed within 30 days after the entry of the judgment); Ill. S. Ct. R. 274 (eff. July 1, 2019) (stating a party may only file one postjudgment motion directed at a judgment order, which must be filed within 30 days of that judgment order or within the time allowed by any extensions). This was notwithstanding that plaintiff also had enveloped that same request in her timely filed motion to reconsider, which the court did have jurisdiction over. Regardless of whether the motion was properly before the court, as stated, we need not consider the matter further given our disposition.

*Blakemore v. Catholic Charities of the Archdiocese of Chicago*, **2025 IL App (1st) 240985**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2023-L-3036; the Hon. Maureen O. Hannon, Judge, presiding. |
| **Attorneys for Appellant:** | Michael W. Rathsack, of Park Ridge, for appellant. |
| **Attorneys for Appellee:** | Robert Marc Chemers and Thomas V.P. Draths, of Pretzel & Stouffer, Chtrd., of Chicago, for appellee. |